**BLUM v. UNITED STATES.**
**No. 14472.**

United States Court of Appeals
Fifth Circuit.
May 6, 1954.

Percy Foreman, Houston, Tex., for appellant.

Brian S. Odem, U. S. Atty., Houston, Tex., William R. Eckhardt, Asst. U. S. Atty., Houston, Tex., for appellee.

Before HOLMES, RUSSELL and RIVES, Circuit Judges.

RUSSELL, Circuit Judge.

Appellant, by an indictment containing seven counts, was charged with unlawfully and knowingly causing false reports to be filed with the Public Housing Administration and with receiving compensation with intent to defraud the Administration and to defeat its purposes.[1] Trial was had to the court without a jury, appellant having waived a jury trial, and he was found guilty on counts 2 through 6, inclusive; acquitted on count 1, and count 7 was dismissed. It was the sentence of the court that he be imprisoned for a term of one year on each of counts 2, 3, 4, 5 and 6, said sentences to run concurrently, and that he pay fines totaling $3,000. This appeal is from that judgment.

The evidence shows that at all times pertinent to the transactions charged in the indictment Blum was the Executive Director of the Housing Authority of the City of Houston, Texas, sometimes hereinafter referred to as the Houston Housing Authority, a position which he had held for a number of years. The Houston Housing Authority is a statutory public body governed by a Board of Commissioners consisting of five members. The Commissioners met once each month for the purpose of discussing the business of the Authority and to determine its policies. However, as found by the trial court, Blum, as Executive Director, "seems to have enjoyed the complete confidence of all of the members of the Commission to such an extent that until July, 1952 he ran the Authority, to all intents and purposes, completely."

Blum and his secretary usually attended the Board meetings and the secretary took notes with regard to the proceedings. Thereafter she would type a rough draft of her notes and submit it to Blum for editing. After these notes were typed in final form copies of them were sent to each commissioner as the minutes of the meeting. The first order of business at each successive meeting was the adoption of minutes of the prior meeting as they were written. At the meeting of December 12, 1950, a discussion was had with regard to increasing the salaries of the management employees. This resulted in the passage of a motion "that the Vice-Chairman [Sparks] and the Executive Director be authorized and directed to work out a new Salary Schedule." The minutes of that meeting, which were formally adopted at the meeting of January 9, 1951, contained the following recital:

"It was the consensus of the Board that the findings of the Vice-Chairman and the Executive Director would be considered as having been adopted by the entire Board, these findings to be made an official paet (sic) of the minutes. This study was completed at the conclusion of the Board meeting and a copy of the new salary of all employees is attached. Copy of new Salary Schedule drawn up by Messrs. Sparks and Blum is also attached."

When copies of these minutes were forwarded to the individual commissioners prior to the January, 1951, meeting the new schedule of salaries, on which Blum was scheduled to receive a $100 monthly increase, was not attached, although it was later made a part of the minutes of the meeting. As a matter of fact, Commissioner Sparks, who was not in attendance at the January meeting, did not participate in the preparation of

I. 18 U.S.C.A. § 1012, as amended.

the new salary schedule and had never seen it until it was exhibited to him during the trial. He had talked to Blum and asked him to submit for consideration his suggestions in the matter, but this was never done. With a single exception none of the commissioners knew that Blum had received this increase in salary, had seen the new salary schedule or had consciously voted to increase Blum's salary as shown thereon. Blum was paid the increased salary from January 1, 1951, until August 1, 1952, and thereby received compensation in the total amount of $1,900 more than he would have received but for his surreptitious conduct in the handling of the minutes of the Board meetings. For accounting purposes Blum's salary was charged to the various housing projects on a pro-rata basis. Since the Public Housing Authority had a contingent liability as to each project to the extent that the matured principal on outstanding bonds and interest exceeded net receipts on the project, Blum's salary increase had the effect of reducing the net income of each project to which it was prorated and thereby increased the contingent liability of the Public Housing Administration.

A public housing project known as "Project No. TEX–5–6" was contemplated by a contract entered into between the Houston Housing Authority and the United States Housing Authority [2] in 1940. Plans for the development of this project were delayed by World War II, however, an advance loan of $51,338 was made to the Houston Housing Authority under the terms of this contract in December, 1943. In January, 1951, a site which was later used for the construction of Project No. TEX–5–6 was donated to the Houston Housing Authority by a local citizen, Mrs. Susan V. Clayton. The 1940 "Contract for Loan and Annual Contributions" was superseded by an "Annual Contributions Contract" entered into as of June 30, 1951, which in turn

was amended and consolidated with a contract entered into by the parties on January 2, 1952. All of these contracts were made pursuant to the United States Housing Act of 1937, as amended, 42 U. S.C.A. § 1401 et seq., and specified in detail the extent of the Public Housing Administration's participation in Project No. TEX–5–6.

When the building site was donated to the Houston Housing Authority it contained a number of substandard dwellings from which rent was being collected. After the Authority accepted the donation in January, 1951, an employee of that body continued to collect the rentals and did so until about June 30, 1951. These rentals, in the total amount of $3412.45, were turned over to Blum and were never deposited to the Authority's account. Blum did not account to anyone for these rentals, although he had no authority to take personal charge of them or to use them for any purpose, either personal or official. Upon Blum's advice that the funds did not belong to the Authority, and because of the manner in which he handled them, they were omitted from reports later filed by the Authority with the Public Housing Administration identified as "Analysis of Expenditures and Budget Control Statement", dated June 30, 1951; "Certificate of Purposes", dated November 30, 1951, and a balance sheet, dated December 31, 1951. In the case of each report the amount collected as rentals should have been included in the report and to the extent that it was not, each report was false.

In addition to Project No. TEX–5–6 there were several other housing projects over which Authority had supervision and control. One of these was a temporary veterans' housing project referred to in the record as "Texas V–41740". By arrangements made with the City of Houston, the Authority acted as "rental agents" for this project. Under a contract between the Public Housing Ad-

2. The name of this agency was changed to Public Housing Administration under Reorganization Plan No. 3 of 1947, effective July 27, 1947, 61 Stat. 954, 5 U.S. C.A. following section 133y–16.

ministration and the City of Houston all of the net revenues derived from the operation and management of this project were to be paid to the Administration at specified times.

A custom had grown up within the Authority which permitted its employees, as well as the members of the Board, to make purchases of various products through the Authority and thereby permit the purchasers to take advantage of quantity discounts which were accorded the Authority. Blum participated in this practice and over a period of years had made purchases totaling several thousand dollars in this manner. Ordinarily when such purchases were made they were paid for by checks issued by the Authority. Thereafter, the Authority would bill the individual involved and accept payment from him. On November 4, 1949, there was delivered to Blum's residence at "Post Oak & Memorial" in Houston, at his direction, 48 cubic yards of shell by Parker Brothers & Co., Inc., Houston. An invoice covering this shell in the amount of $84 was submitted by Parker Brothers to the Authority on the same date. This invoice was paid by Authority on December 30th with a check signed by Blum as Executive Director. At the time Blum signed the check there was attached to it the Parker Brothers' invoice showing that the shell was delivered to "Post Oak & Memorial". Blum was never billed for this purchase by Authority and never reimbursed Authority. The purchase was charged on the records to project number "Texas V–41740." This resulted in an increase in the cost of operating and managing that project in the amount of the cost of the shell, $84. A report was filed with the Public Housing Administration on or about January 31, 1950, designated as "Operating Statement". In that this report included the cost of the shell, on which no discount was granted, as an expense of the project and thus reduced the net revenue of the project by the amount of $84, it was false.

Blum, as a witness in his own behalf, denied that there were any irregularities in connection with the increase in salary which he received, especially since the increase was authorized by the Board as evidenced by its minutes. He admitted receiving the rentals and spending them, according to his testimony, for purposes intended to promote public housing, but denied that they were the property of the Authority or that they should have been reported on the alleged false reports filed with the Public Housing Administration. Blum also admitted that he purchased the shell in the manner described, but contended that his failure to pay for it was an oversight on the part of both himself and the Authority. In all things he denied any fraudulent intent and urged that his participation in the matters referred to was in the utmost good faith.

Counts 2, 3 and 4 of the indictment relate to the filing of the false reports which omitted the rentals which were received by Blum between January 3rd and June 30th, 1951; count 5 relates to Blum's unauthorized receipt of excessive compensation from January 1, 1951 to July 31, 1952, and count 6 has reference to the so-called shell transaction. Each of the counts charge a violation of section 1012, Title 18 U.S.C.A.[3] Prior to trial, Blum filed a motion to quash counts 1, 2, 6 and 7 of the indictment on the ground that the act under which the indictment was returned was not passed until October 31, 1951, and, since the violations charged in those counts transpired prior to that time, prosecution on those counts would be violative of Ar-

3. 18 U.S.C.A. § 1012. Public Housing Administration transactions

"Whoever, with intent to defraud, makes any false entry in any book of the Public Housing Administration or makes any false report or statement to or for such Administration; or

"Whoever receives any compensation, rebate, or reward, with intent to defraud such Administration or with intent unlawfully to defeat its purposes; or

\* \* \* \* \*

"Shall be fined not more than $1,000 or imprisoned not more than one year, or both."

ticle 1, section 9, clause 3 of the Constitution of the United States as giving retroactive, or *ex post facto*, effect to the act. The overruling of this motion is assigned as error.

The act of October 31, 1951, referred to in Blum's motion to quash, was merely an amendment to section 1012, supra, indicating the change of the name of the United States Housing Authority to Public Housing Administration. Although the name of that agency had previously been changed,[4] it was not until October, 1951, that section 1012, which provided the criminal sanctions here involved, was amended solely for the purpose of reflecting this change of name. This amendment "did not make criminal and punishable any act that was innocent when committed, nor aggravate any crime previously committed, nor inflict a greater punishment than the law annexed to such crime at the time of its commission, nor alter the legal rules of evidence in order to convict the offender."[5] Blum was not prejudiced by the 1951 amendment and his situation was in no way adversely affected by it, either prospectively or retrospectively. The amendment, being one of form only, did not give rise to the principles contended for by appellant.

The contention that Blum's conduct, as charged in the various counts of the indictment and described by the evidence herein recited, did not violate section 1012, supra, requires but little comment. This contention is predicated, as to the false reports, upon appellant's advocated construction of the statute to inhibit only employees of the Public Housing Administration from filing false reports with it and, as to the unauthorized compensation, upon the claim that the indictment fails to show in what manner Blum's receipt of such compensation could defraud, or defeat the purposes of, the Public Housing Administration. The language of the statute is clear and unambiguous and is not susceptible to the construction contended for. "Whoever", as used in the statute, includes any person who makes any false report or statement "to or for" the Administration. Clearly this language does not limit the operation of the statute to the employees of the Administration, but was intended to, and does, include such persons as Blum. As to the claim that the indictment under count 5[6] did not sufficiently charge a criminal offense under the statute, it is sufficient to say that this count, drawn in the language of the statute, sufficiently alleged the essential ingredients of the offense charged. Properly construed, appellant's argument in this connection goes not to the sufficiency of the indictment, but to the sufficiency of the evidence to sustain his conviction under it. As we have hereinbefore observed, Blum's fraudulent conduct in effecting an unauthorized increase in his salary had a direct relation to the contingent liability of the Public Housing Administration, a result well calculated to defraud the Administration and to defeat its purposes.

We have carefully reviewed the evidence in the light of appellant's argument that it fails to sustain the finding of the trial court that appellant was guilty of the requisite intent to defraud as charged in counts 2, 3, 4, 5 and 6 of the indictment. The factual recitals we have

4. Footnote 2, supra.

5. Gibson v. State of Mississippi, 162 U.S. 565, 589, 16 S.Ct. 904, 910, 40 L.Ed. 1075.

6. "That one E. W. Blum, during the period from on or about January 1, 1951, to on or about July 31, 1952, within the Houston Division of the Southern District of Texas and within the jurisdiction of this Court, did unlawfully and knowingly receive compensation, towit: over-

payment of salary in excess of the amount of salary authorized to be paid to the said E. W. Blum by the Board of Commissioners of the Houston Housing Authority of the City of Houston, Texas, in the sum of approximately One Thousand, Nine Hundred Dollars ($1900.00), with intent to defraud the Public Housing Administration and with intent to defeat its purposes. (Violation Section 1012, Title 18, United States Code)."

**912**

made reflect those accepted and adopted by the trial court, as evidenced by its findings. Determination of factual questions was the duty and function of that tribunal. The evidence supports its findings and the Court was not required to accept Blum's exculpatory explanations. There is present no basis for our overturning the factual determinations upon which were based the judgments of guilt.

Judgment affirmed.