# United States Court of Appeals
## For the First Circuit

Nos. 06-1484 & 06-1501

UNITED STATES,

Appellee,

v.

ISMAEL ALFONZO-REYES and VANESSA MORALES-HERNÁNDEZ,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Jay A. Garcia-Gregory, U.S. District Judge]

Before

Lynch, Chief Judge,
Gajarsa[*] and Lipez, Circuit Judges.

Raymond L. Sanchez Maciera for Appellant Alfonzo-Reyes.

Rachel Brill for Appellant Morales-Hernández.

Rosa Emilia Rodríguez-Velez, with whom Nelson Perez-Sosa was on the brief, for Appellee.

January 25, 2010

[*] Honorable Arthur J. Gajarsa, Circuit Judge, United States Court of Appeals for the Federal Circuit, sitting by designation.

**GAJARSA**, <u>Circuit Judge</u>.  Ismael Alfonzo-Reyes ("Alfonzo") and Vanessa Morales-Hernández ("Morales") (collectively "appellants") appeal judgments of the United States District Court for the District of Puerto Rico.  The judgments found appellants guilty of defrauding the Farm Service Agency ("FSA") of emergency loans and incentives to qualified farmers following the damage inflicted on the Commonwealth of Puerto Rico by Hurricane Georges.  Following an 82-day jury trial, appellants were convicted of fraud and bribery relating to various FSA loan applications.  Appellants timely appealed their convictions.  For the reasons stated below, the judgments are affirmed.

## I.

On September 21, 1998, Hurricane Georges swept through Puerto Rico causing significant structural and environmental damage to the island.  The President of the United States declared the island a major disaster area, entitling the Commonwealth to various federal aid programs.  In the wake of the hurricane, numerous Puerto Rican farmers applied for emergency loans through the FSA, the federal agency responsible for administering aid to eligible farmers after a natural disaster.

Under the FSA program, farmers may qualify for an emergency loan up to $500,000 or for an operating loan up to $200,000 for rebuilding farming operations.  Farmers may also qualify for loans under the Livestock Indemnity Program for perished

-2-

livestock and the Emergency Conservation Program for debris removal and for fence and road repairs. The FSA program has several eligibility requirements, including the farm size and a farmer's ability to obtain commercial loans.

Appellants Alfonzo and his wife[1] Morales were residents of Puerto Rico when Hurricane Georges struck the island. Alfonzo was employed as a FSA loan manager and Morales worked as a FSA contract employee in Ponce, Puerto Rico. Morales had previously worked at the law office of Efrén Irizarry-Colon ("Irizarry") in Arecibo, Puerto Rico preparing FSA loan applications and earning a four percent commission on the loans.

Because appellants challenge the sufficiency of the evidence used to convict them on various counts, we recount the facts in the light most favorable to the verdict. United States v. DeCologero, 530 F.3d 36, 47 (1st Cir. 2008). We outline the case here in general and analyze further facts as relevant to the sufficiency claims later in the analysis.

In October 1998, Alfonzo met with José Torres-Correa ("Torres"), the FSA Program Director, to reveal his plan to defraud the FSA. Alfonzo explained that Morales would process the cattlemen's applications out of Irizarry's law firm for a four percent commission on the loans. Alfonzo offered Torres kickbacks of one percent of the loans, or approximately $130,000 ($80,000 in

_____

[1] Appellants are no longer married.

-3-

cash and forgiveness of $50,000 in debt) for expediting, approving, and disbursing these loans. Alfonzo needed Torres' participation in the scheme because Torres was authorized to approve loans in excess of $300,000 as the FSA Program Director.

Between September 28, 1998, and January 22, 1999, appellants submitted FSA loan and incentive applications bearing false information on behalf of thirteen dairy farmers for alleged damage to various dairy farms owned by the Toledo family.[2] Morales inflated the damage and loss amounts in each application, and Alfonzo instructed the farmers to obtain falsified invoices, estimates, and certifications to support their claimed losses. Torres approved approximately $10 million in FSA relief. In exchange for approving the fraudulent loan applications, Torres received $18,000 in kickbacks and forgiveness of $50,000 in debt.

According to numerous witnesses at trial, the criminal scheme was pervasive and systemic. It involved multiple actors throughout the Arecibo region of Puerto Rico. Farmers were required to obtain invoices demonstrating damage to their farms caused by the hurricane to support their FSA loan applications. As a result, a group of contractors, suppliers, and agronomists provided invoices, certifications, and estimates containing information they knew to

---

[2] The dairy farms owned by various Toledo family relatives include the Toledo Dairy, Inc., Gregorio Toledo, Inc., J. Dairy, Inc., and Café Dairy, Inc. (hereinafter, "the Toledo family dairy farms").

-4-

be false or simply chose not to verify. Veterinarians provided false certifications to dairy farmers concerning the number of livestock killed as a result of Hurricane Georges. Doctor Rivera-Hernández ("Rivera"), a veterinarian, spoke to Alfonzo on the telephone to express his concern that a cattleman asked him to certify untrue information regarding the number of perished livestock. Alfonzo assured Rivera that he would not be held responsible for providing a false certification.

Appellants accepted various bribes from cattlemen for their assistance in procuring fraudulent FSA loans. Alfonzo received hefty cash bribes. In January 2000, a number of cattlemen pooled together $10,000 in cash and gave it to Alfonzo in the Arecibo FSA office parking lot. The farmers included a list of the names of the contributors so that Alfonzo would know who gave him the money. The farmers provided cash donations to Alfonzo to put them in a "better position" to obtain future benefits through the FSA. They also made certain payments to Alfonzo "in appreciation" for helping them obtain the federal aid. In the fall of 2000, Morales accepted a bribe in the form of free auto body repairs from two cattlemen in Hatillo, Puerto Rico. The cattlemen provided the complimentary repairs of Morales' automobile "in appreciation" for Alfonzo's assistance in procuring past and future FSA incentives.

Alfonzo also committed fraud regarding various loans provided by commercial banks in the Arecibo region. To obtain

emergency loans through the FSA, farmers were required to show that they were financially unable to obtain a commercial loan. In July 1999, Alfonzo requested commercial loan denial letters from the Arecibo branch of Puerto Rico Farm Credit. Esther Morales, a manager of the Arecibo branch, testified that Alfonzo requested loan denial letters for the Toledo Family dairy farms. Ester Morales had never before provided such a letter for a FSA employee. Other employees of commercial banks in the Arecibo region testified that cattlemen applied for loans with no serious expectation of receiving them because they offered insufficient collateral and sought a rate of interest well below prevailing market rates.

FSA employees in the Arecibo office began to develop suspicions regarding statements and information contained in the loan applications. Arlette Arana, a contract employee in the Arecibo office, performed on-site farm inspections to verify the claimed damages used to calculate the Emergency Conservation Program incentive awards. Arana's estimates of the farmers' damages did not correlate with the farmers' invoices for repair costs. Despite the discrepancies, Alfonzo instructed Arana to increase the Emergency Conservation Program incentive awards even in cases where a farmer presented invoices claiming greater repair costs than her on-site damage estimates. Jorge Ramírez, a clerk in the FSA Arecibo office, also worked on Emergency Conservation Program payments. Ramírez spoke with Arana about the irregularities contained in the Emergency

Conservation Program files. Ramírez and Arana shared their concerns with Alfonzo. Alfonzo instructed them to accept the files as submitted, told them it was not their duty to investigate, and assured them they were not responsible for the farmers providing false information.

Employees from other FSA offices also developed suspicions. In December 1998, an unannounced investigation team of FSA employees led by Melissa Cummings reviewed some of the Arecibo office's files. Cummings issued a memorandum outlining the deficiencies and dearth of documentary support for damage claims. She noted the possibility of fraudulent inflation of the loan amounts based on the fact that Irizarry's office charged a commission based on the disbursed loan amount.

In January 2000, Clarence Ropp, a senior loan officer of the United States Department of Agriculture ("USDA"), visited the Arecibo office to review the loan applications handled by Irizarry's firm. In reviewing the loan applications, Ropp could not find any closing documentation. When Ropp questioned Alfonzo about the missing documents, Alfonzo admitted to handling those applications differently. Ropp observed that the investigation team's notes outlining the application deficiencies had been removed from the files. Alfonzo told Ropp that he discarded the notes after reviewing them and after making the necessary corrections in the loan files. Ropp also noted that the loan applications failed to

disclose Irizarry's fee, although that information should have been clearly listed on the loan's settlement statement. Ropp's review concluded that Alfonzo had been approving loans based upon improper and incomplete loan applications.

In March 2000, Ropp returned for a second visit to the Arecibo office to perform an internal review of all FSA loans made in Puerto Rico from 1999 to 2000. Ropp noted that, while a number of applications filed by other FSA offices contained inadvertent errors, the files from the Arecibo office contained intentional errors and deficiencies, e.g., lack of closing documents, untracked funds, and ambiguity regarding whether the files were open or closed. The mistakes Ropp observed in the Arecibo applications were not the type of mistakes made by the other FSA offices in Puerto Rico. Accordingly, Ropp requested that the Arecibo applications be referred to an investigator. Ropp also testified that the fraudulent loans made as a result of Hurricane Georges' disaster depleted the FSA emergency funds in a single fiscal year for the first time in the program's history.

Alfonzo was also involved in procuring a fraudulent loan for Angel Ramón Alvarez-Rodríguez ("Alvarez"), a produce farmer whose farm was damaged by Hurricane Georges. When Alvarez visited Alfonzo at the FSA office in Ponce, Alfonzo recommended that Alvarez apply for a commercial loan from Banco Santander ("Santander"). Alvarez applied for a $150,000 loan. Alfonzo provided Alvarez with

a letter dated January 14, 1999, stating that Alvarez's FSA loan for $100,000 had been approved, and when issued, the proceeds could be used to repay the bank loan. This was false information because Alvarez's FSA loan was in fact not approved until almost a year later on December 13, 1999.

After Alvarez applied for the Santander loan, Alfonzo asked him to personally lend him $100,000 to avoid losing his farms that were financially vulnerable. When Alvarez told Alfonzo that he did not have the funds to make such a loan, Alfonzo suggested that his Santander loan could be increased to $250,000. Alvarez agreed and amended his loan application requesting a loan for $250,000.

Alfonzo subsequently sent a letter to Santander on January 21, 1999, stating that Alvarez had been approved for a $250,000 FSA loan. This letter was submitted to the bank's credit committee. Alfonzo later advised Fernando Fernández-Cintron ("Fernández"), the manager of the Ponce branch of Santander, that the earlier letter stating that Alvarez had been approved for only a $100,000 FSA loan was an error. Premised on the amended FSA letter, Alvarez received a $250,000 loan from Santander. He testified that Alfonzo was at the bank when he closed on the loan, asking for a $100,000 check. The check, however, was made payable to Ignacio Pintado, a well-reputed coffee farmer from Yauco to conceal the true nature of the transaction. Fernández corroborated Alvarez's story, testifying

that Alfonzo and Pintado were present at the closing and had asked for temporary checks to be issued to Alvarez. Fernández also testified that if Santander knew Alvarez's FSA loan had not been approved, his loan through Santander would have been denied.

On April 2, 2004, a grand jury returned a true bill on a superseding indictment[3] charging Alfonzo and Morales with various acts of fraud and bribery relating to the FSA loan applications. Count 1 charged appellants with willful conspiracy to defraud the FSA of $10 million in the process of evaluating, approving, and disbursing emergency and operating loans and incentives to qualified farmers following the Hurricane Georges disaster. Counts 2 through 19 charged appellants with making false statements to the FSA regarding emergency and operating loans for the Toledo dairy farms. Counts 20 and 21 charged Morales and Alfonzo, respectively, with bribery of the FSA Program Director, and Count 22 charged Alfonzo with violation of 18 U.S.C. § 208 for assisting a farmer in obtaining a commercial loan in which Alfonzo had a personal financial interest. Counts 23 through 42 charged Morales and Alfonzo with additional violations of 18 U.S.C. § 1014 in connection with emergency and operating loans for numerous cattlemen in the Arecibo region. Counts 43 through 62 charged Alfonzo with assisting

---

[3]     The original indictment issued approximately a year earlier on April 25, 2003 and charged Alfonzo and Morales with similar but fewer Counts relating to their fraudulent conduct involving various FSA loan applications.

in the submission of false applications for livestock indemnities and other FSA incentives, improper supplementation of income, and assisting in making false statements on the loan applications of two Toledo family members.

Following an 82-day trial, a jury found appellants guilty of all Counts with the exception of Counts 41 and 47.[4] Morales was sentenced on February 13, 2006, and judgment was entered on February 17, 2006. Alfonzo was sentenced on February 17, 2006, and a judgment was entered on March 13, 2006. Appellants filed timely notices of appeal. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

Appellants raise multiple issues regarding their convictions. Morales and Alfonzo jointly appeal three issues: (A) whether appellants were charged with non-existent federal offenses in violation of the Constitution's Ex Post Facto Clause, (B) whether the evidence was sufficient to support appellants' convictions, and (C) whether the district court erred in submitting certain sentencing guideline enhancements to the jury. Morales individually raises two additional issues specific to her case,

---

[4] Count 41 charged Morales with making false statements on a FSA loan application in violation of § 1014; Count 47 charged Alfonzo with assisting with the submission of false applications for livestock indemnities in violation of § 1014. The trial judge dismissed these Counts for insufficient evidence as a result of appellants' Rule 29 motions.

namely (D) whether the district court abused its discretion in disqualifying her attorney before trial, and (E) whether the district court committed reversible error by imposing an unreasonable sentence. Alfonzo individually appeals only an additional issue, namely (F) whether the district court erred in assessing a four-point leadership role enhancement to his sentence. We consider these issues in turn.

A.   Appellants' Convictions Do Not Violate The Ex Post Facto Clause

Counts 1–19, 23–58 and 61–62 and Counts 2–13 and 23–42 charged Alfonzo and Morales, respectively, for submitting fraudulent reports to the FSA, a successor agency to the Farmers Home Administration ("FHA"), in violation of 18 U.S.C. § 1014. Appellants argue that § 1014 does not encompass fraud on the FSA before October 22, 1999, the date on which the statute was first amended to include the term "successor agency." See Pub. L. No. 106-78, Title VII § 767, 113 Stat. 1135 (codified as amended in 18 U.S.C. § 1014 (2000)). Appellants assert that prior to that date, § 1014 encompassed false statements or reports made only through the FHA, but not its successor agency, the FSA. Under this theory, a false statement to the FSA prior to October 22, 1999, did not qualify as a violation of § 1014; thus, appellants' acts were not criminal when they were committed.

Between September 1998 and January 1999, the period when appellants were submitting fraudulent FSA applications, § 1014 read:

> Whoever knowingly makes any false statement or report . . . for the purpose of influencing in any way the action of . . . the Secretary of Agriculture acting through the Farmers Home Administration . . . upon any application . . . or loan . . . shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both . . . .

In 1994, however, Congress had eliminated the Farmers Home Administration, had provided for the creation of the FSA as its successor, and had given the FSA jurisdiction over all pre-existing FHA disaster loan programs and other lending programs. See 7 U.S.C. § 6932; see also Barreto-Barreto v. United States, 551 F.3d 95, 97 (1st Cir. 2008). In October 1999, Congress eventually amended § 1014 to reflect this change by adding the phrase "or successor agency" after "the Farmers Home Administration." See Pub. L. No. 106-78, Title VII § 767, 113 Stat. 1135.

Both before and after the 1999 amendment, § 1014 by its terms criminalized knowingly making any false statements "for the purpose of influencing in any way the action of . . ." the Secretary of Agriculture, as well as a number of federal agencies, banks, and credit unions. See 18 U.S.C. § 1014. It is clear from the comprehensive list of entities in § 1014 that the statute's primary concern is to protect a range of federal and affiliated lenders against the common harm of fraud perpetuated by third parties. It is also clear from 7 U.S.C. § 6932 that the FSA inherited substantive responsibility for the FHA disaster loan

-13-

programs.

In light of this context, we conclude that the 1999 amendment to § 1014 to include "successor agency" was merely a housekeeping statute that made § 1014 consistent with the transfer of responsibilities that 7 U.S.C. § 6932 had already effectuated. Whether the FSA or the FHA is the agency administering the loan program does not change the wrongfulness of the third party's fraudulent statements and does not affect the essential characteristics of the crime as defined in § 1014. See Blum v. United States, 212 F.2d 907, 908-09 (5th Cir. 1954) (finding no ex post facto violation where a defendant was convicted of knowingly filing false reports with the Public Housing Administration, previously known as the U.S. Housing Authority, despite the fact that the criminal statute was not amended to reflect the name change for four years). There is no statutory ambiguity that would warrant application of the rule of lenity here, as appellants urge.

Because the 1999 amendment to § 1014 created no new criminal liability, imposed no greater punishment, and did not alter the rules of evidence, we hold that appellants' convictions do not violate the Ex Post Facto Clause.

B.    The Evidence Is Sufficient To Support Appellants' Convictions

Appellants argue that the evidence is insufficient to convict them. Alfonzo challenges the sufficiency of evidence for Counts 2—13, 22—30, 42, 44, 53 and 58—60, and Morales challenges

-14-

the sufficiency of evidence for Count 20.  This Court reviews Rule 29 motions for acquittal de novo.  United States v. Godin, 534 F.3d 51, 62 (1st Cir. 2008).

Rule 29 of the Federal Rules of Criminal Procedure provides that a court may acquit a defendant after the close of the prosecution's case if the evidence is insufficient to sustain a conviction.  In evaluating the sufficiency of the evidence, we consider whether, in viewing the evidence in the light most favorable to the jury's verdict, "a rational fact finder could find that the government proved the essential elements of its case beyond a reasonable doubt."  United States v. Marin, 523 F.3d 24, 27 (1st Cir. 2008).  We review appellants' challenges in turn.

1.  The Bribery Charge Against Morales

Count 20 charged both Morales and Alfonzo with aiding and abetting each other in bribing, and with directly and indirectly bribing and attempting to bribe, Torres, the FSA Program Director. The substantive offense against Morales was a violation of 18 U.S.C. § 201(b)(1); the aiding and abetting offense was a violation of 18 U.S.C. § 2.  The bribery charged was promising $130,000, and giving $18,000 in cash, to Torres to influence him to approve and authorize disbursement of unqualified loans to cattlemen in Arecibo.

Morales argues that even if there were enough evidence that Alfonzo made a direct cash payment of $18,000 to Torres and

forgave a $50,000 debt, there was insufficient evidence that she was directly involved or that she knew any money she was earning would be used to pay a bribe to Torres. Of course, she need not have actually been the person to pay the bribe to be culpable, see United States v. Dixon, 658 F.3d 181, 191 (3d Cir. 1981), and she does not contend that. More specifically, she argues there was testimony that she was not present at the meeting where the scheme was hatched and that her arrangement with Irizarry was not sufficient to show her involvement with the scheme to bribe Torres. The mere fact that she and Torres were married alone would not be sufficient. But there was more evidence than that, and it was sufficient.

The government introduced circumstantial evidence showing that Alfonzo coordinated the criminal scheme with Torres and Morales, and sent the cases to the Arecibo office for Morales to process. At the Arecibo office, Morales compiled the fraudulent loan applications, inflated the claimed damages, and submitted falsified documents to substantiate the claimed losses. There is also evidence showing that Alfonzo told Torres that he would get paid "little by little as the cases were closed," and that Morales deducted money from the accounts to pay Torres. This is sufficient evidence for the jury to conclude that Morales consciously shared Alfonzo's knowledge of the scheme to defraud the FSA, and worked to further the scheme by processing numerous FSA applications with

inflated damages and falsified invoices.

2.    The Banco Santander Fraudulent Loan Charge

Count 22 alleged that Alfonzo helped Alvarez obtain a commercial loan from Santander in which Alfonzo had a personal financial interest in violation of 18 U.S.C. §§ 208 and 216(a)(2). The government asserted that Alfonzo, in his capacity as a FSA loan manager, wrote a letter falsely stating that Alvarez had been approved for a $100,000 FSA loan that would be used to repay the commercial loan from Santander.

Alfonzo argues that there is insufficient evidence to show that he participated in the processing of the emergency loan request. However, whether Alfonzo personally participated in the processing of the emergency loan request is immaterial. To establish a violation of § 208, the government must prove beyond a reasonable doubt that the defendant (1) was an officer or employee of the executive branch or an independent agency; (2) participated personally and substantially in his official governmental capacity in a matter; and (3) knew that he had a financial interest in that particular matter. United States v. Nevers, 7 F.3d 59, 52 (5th Cir. 1993). The elements of the crime under § 208 are supported by sufficient evidence. Alfonzo, while employed as a FSA loan manager, personally and substantially participated in his official capacity by sending a letter on behalf of the FSA to Santander. Alfonzo's letter falsely stated that Alvarez's FSA loan had been

-17-

approved, when in fact, Alfonzo knew that it had not been approved. The government also established that Alfonzo had a personal financial interest in the Santander loan, which he intended to use to save his financially vulnerable farms. Accordingly, there is sufficient evidence to support Alfonzo's conviction on Count 22.

3. The Fraudulent Loan Charges

Counts 2–13, 23–30 and 42 charged Alfonzo with making false statements in violation of 18 U.S.C. §§ 2(a) and 1014. Counts 2-13 concerned the Toledo family's emergency and operating loans for alleged damage to their dairy farms. Counts 23-30 concerned the Barreto family's loans. Count 42 concerned Jorge Delgado-Peréz's emergency loan for $500,000.

To establish a violation of § 2(a), the government must prove that (1) the principal knowingly submitted false statements; and (2) the accomplice consciously shared knowledge of it, associated himself with it, and intended to help ensure its success. García-Carrasquillo, 483 F.3d at 130. To establish a violation of § 1014, the government must prove that (1) the defendant made a false statement; (2) the defendant acted knowingly; and (3) the false statement was made for the purpose of influencing action on the loan. Tierney, 266 F.3d at 40.

Alfonzo argues there is insufficient evidence to support his conviction in the absence of direct evidence showing his participation in submitting the fraudulent loan applications. In

-18-

particular, Alfonzo asserts that in order to find him guilty, the jury improperly inferred that Morales "told him about the infirmities" in the loan applications. Direct evidence is not required to find him guilty, and juries are entitled to draw reasonable inferences at trial based on circumstantial evidence. See Rodríguez-Durán, 507 F.3d at 758; Downs-Moses, 329 F.3d at 261.

There is sufficient circumstantial evidence to support the jury's finding that Alfonzo was guilty of making false statements to obtain FSA loans. Multiple witnesses at trial testified that Alfonzo's wife Morales intentionally inflated the damages on the loan applications and instructed the cattlemen to obtain falsified invoices. Other witnesses testified that they met with Alfonzo after applying for FSA loans and that he was concerned about their loan applications being investigated. The investigator testified that Alfonzo made excuses for failing to turn over the files in question and also made excuses for why these files contained discrepancies. Based on this evidence, the jury was permitted to infer that Alfonzo shared knowledge of the cattlemen's false statements in the loan applications.

4. The Fraudulent Livestock Indemnity And Emergency Conservation Application Charges

Counts 44, 53 and 58 charged Alfonzo with making false statements in connection with applications relating to the Livestock Indemnity and Emergency Conservation Programs in violation of §§ 2(a) and 1014. Counts 44 and 58 alleged that

-19-

Alfonzo knowingly and willfully made false statements in connection with applications for Livestock Indemnity funds in the amount of $18,868, and for Emergency Conservation funds in the amount of $14,837, on behalf of Nelson Ramos-Irizarry ("Ramos"). Count 53 alleged that Alfonzo knowingly and willfully made false statements and overvalued land, property, and security to fraudulently obtain Emergency Conservation funds in the amount of $19,200 for Teodoro Alfonzo-Toledo ("Toledo").

Alfonzo argues that the government did not elicit any testimony concerning Alfonzo's direct participation in the submission of false information. We disagree. For Count 44, there is sufficient circumstantial evidence including: the close relationship between Alfonzo and Ramos; several meetings between Alfonzo and Ramos to discuss intentional inflation of losses in cattle; and Alfonzo's instructions to obtain a letter from a veterinarian certifying the number of perished cattle to receive additional FSA incentives. For Count 58, there is also sufficient circumstantial evidence that Alfonzo met with Toledo on several occasions to discuss expediting falsified loans under the FSA, and that they shared tips on how to increase amount of falsified damages on the loan applications. For Count 53, Toledo testified that he contributed a $1,000 "donation" to Alfonzo for expediting the loans. Toledo also testified that he personally attended the "donation" meeting to ensure that Alfonzo would help the cattlemen

obtain FSA benefits. Accordingly, there is sufficient circumstantial evidence upon which the jury can infer Alfonzo's guilt for Counts 44, 53, and 58.

5.   The Improper Income Supplementation Charge

Counts 59 and 60 charged Alfonzo with knowingly and willfully receiving improper payments from FSA clients in violation of 18 U.S.C. §§ 209 and 216. Count 59 alleged that Alfonzo received a cash payment of $10,000. Count 60 alleged that Alfonzo received payment in the form of auto body repairs to his wife's automobile.

To establish a claim under § 209, the government must establish the following four elements: (1) a non-government party (2) makes a contribution or supplementation to (3) the salary of an executive branch official (4) as compensation for his services as an officer or employee of the executive branch. See United States v. Project on Gov't Oversight, 543 F. Supp. 2d 55, 62 (D.D.C. 2008). The last element requires two inquiries: (1) what the disputed payment is for, i.e., what activity prompted the compensation; and (2) the subjective intent of the parties to determine what the payment was actually for, especially where there are various activities that could have motivated the payment. Id.

Alfonzo argues that there is insufficient evidence to support his convictions on Counts 59 and 60 because the $10,000 cash payment and automobile repairs were "gifts." Alfonzo also

-21-

argues that no witnesses testified that they paid Alfonzo for his FSA services. These assertions are without merit. In support of Count 59, numerous cattlemen testified that they provided the cash payment to Alfonzo to place them "in a better position to obtain" future benefits through the FSA, and that they donated the money to Alfonzo "in appreciation, because he had helped [them] get those benefits." In support of Count 60, several witnesses testified that they paid for the repairs performed on Alfonzo's wife's automobile to get on Alfonzo's "good side" and "to please" Alfonzo. Accordingly, there is sufficient evidence that non-government parties improperly supplemented Alfonzo's income in exchange for the services he rendered as a FSA employee. This is sufficient to support Alfonzo's convictions on Counts 59 and 60.

C.    The District Court Did Not Abuse Its Discretion By Instructing The Jury On Sentencing Enhancements

Appellants argue that the district court erred in instructing the jury on definitions regarding certain sentencing enhancements. Appellants' trial commenced on June 8, 2004. At that time, Apprendi v. New Jersey, 530 U.S. 466, 490 (2000) governed the law on sentencing. The Apprendi standard requires that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt." Apprendi, 530 U.S. at 490. On June 24, 2004, during the middle of the trial, the Supreme Court issued Blakely v.

-22-

Washington, 542 U.S. 296 (2004), which held that "a sentence that was enhanced on the basis of factors found by the judge, rather than the jury, violated the defendant's constitutional right to a trial by jury." United States v. Lopez, 380 F.3d 538, 541 n.1 (1st Cir. 2004). It was unclear at the time whether Blakely applied to the Federal Sentencing Guidelines or had retroactive effect. To resolve the issue, the parties agreed to rely on the Apprendi standard. As a prophylactic measure, the judge asked the jurors to fill out a special verdict form.

Appellants assert that they were prejudiced by the jury's consideration of certain sentencing enhancement questions. Morales objects to the jury's consideration of whether she took significant affirmative steps to conceal the offense; whether she applied more than minimal planning to accomplish the scheme; and whether Morales used "a skill not possessed by members of the general public [that] usually requires substantial education, training or licensing." Alfonzo challenges the jury's consideration of whether he had a leadership role in the offense; the amount of loss; whether he applied more than minimal planning; and whether he abused the public trust.

We understand the arguments to fall into two basic categories. The first is a claim that, since the case was not bifurcated into a guilt phase and then a penalty phase, it was error to have the jury focus on issues that assumed guilt. The

district court, avoiding this risk, instructed that the jury should deliberate on these issues if and only if they had already concluded the defendants were guilty. This is not a situation in which a jury might reasonably do the reverse, as in United States v. Spock, 416 F.2d 165, 183 (1st Cir. 1969). Further, there was strong evidence of guilt.

Second, there is an objection to the content of the loss instruction, which Morales claims misstated the definition of the term "loss" as it was used in the Sentencing Guidelines. It is unclear that Morales timely objected to this instruction. Regardless of whether we review this instruction for an abuse of discretion rather than plain error, however, the district court's definition of loss did not materially diverge from the then-governing definition in the Sentencing Guidelines, and there is no indication of prejudice.

D.   The District Court Did Not Abuse Its Discretion In Its Pre-Trial Disqualification Of Morales' Attorney

Morales argues that her Sixth Amendment right to counsel was violated because the district court disqualified her chosen attorney, Maria Sandoval, before trial. She was represented by other counsel at trial. The district court found that there was an actual and potential conflict of interest because Attorney Sandoval previously represented a government witness who was scheduled to testify against Morales' husband and co-defendant, Alfonzo. We review the district court's disqualification decision for abuse of

-24-

discretion. United States v. Lanoue, 137 F.3d 656, 663 (1st Cir. 1998).

The Sixth Amendment guarantees the right to the assistance of counsel in a trial for any serious crime. Gideon v. Wainwright, 372 U.S. 335, 343 (1963). An element of that right is "the right of the defendant who does not require appointed counsel to choose who will represent him." United States v. Gonzalez-Lopez, 548 U.S. 140, 144 (2006). In evaluating Sixth Amendment claims, "the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such." United States v. Cronic, 466 U.S. 648, 657 n.21 (1984). Accordingly, although a defendant may generally waive his Sixth Amendment right to a non-conflicted attorney, "the essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." Wheat v. United States, 486 U.S. 153, 159 (1998); see also Morris v. Slappy, 461 U.S. 1, 13-14 (1983). Against this background, our review is deferential and the district court has broad latitude. Lanoue, 137 F.3d at 663.

Before trial, the magistrate judge disqualified Attorney Sandoval, finding that an "actual conflict of interest exists" and, in addition, warned of "other potential conflicts which may metamorphose into actual conflicts as the case progresses." In

-25-

support of this decision, the magistrate judge, after a hearing, found five "crucial" facts[5]:

> (i) Attorney Sandoval, previous to her involvement in this case, represented [government witness] "GW" in a drug conspiracy and money laundering case unrelated to this case;
> (ii) Following his sentence in a drug case, GW became a government cooperator;
> (iii) At the time GW approached the government to become a cooperator, Attorney Sandoval continued to represent him;
> (iv) Besides cooperating in the drug-related matters subject of an ongoing investigation, GW was present at the time a co-defendant in this case was bribed. This co-defendant is Ismael Alfonzo-Reyes who is the defendant's husband;
> (v) the [g]overnment has announced that GW will be a witness in the present case, which involves a conspiracy charge[] [sic].

Morales argues that there was no actual conflict warranting disqualification, and even if there were, any potential conflict could have been waived by both clients. In particular, she asserts that the government witness was willing to waive the attorney-client privilege and represented this willingness to the district court. There is no record that such a waiver actually occurred, so that argument is hypothetical.

With respect to a potential conflict of interest, this Court has noted that such a conflict "is a matter that is uniquely

---

[5] Following oral argument, the parties submitted letter briefing to clarify an alleged "factual dispute" material to the disqualification issue. After a careful review of the record, we conclude that the trial court based its decision on sound factual findings relating to the conflict of interest.

-26-

factual and presents a special dilemma for trial courts." <u>Lanoue</u>, 137 F.3d at 663. Accordingly, "[t]he evaluation of the facts and circumstances of each case . . . must be left primarily to the informed judgment of the trial court." <u>Wheat</u>, 486 U.S. at 164.

In this case, Attorney Sandoval's representation may have placed her in the position of having to cross-examine her former client, a witness with whom she shared confidences protected by attorney-client privilege. The district court could conclude the matters were sufficiently related given some evidence linking the government's potential witness, GW, to co-defendant Morales.

Morales argues that "the prosecution neither called nor alluded to this purportedly 'important' witness during the entire course of the trial," which "only compound[ed] the error" of disqualification. But a court's decision on disqualification is not made with the clarity of hindsight. The Supreme Court in <u>Wheat</u> explained that a district court's decision to disqualify counsel is based on the facts presented at the time of the disqualification motion, and does not turn upon subsequent events at trial — i.e., whether the witness ultimately takes the stand:

> [W]e think the district court must be allowed substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists <u>which may or may not burgeon into an actual conflict as the trial progresses</u> . . . .

486 U.S. 153, 163 (1998) (emphasis added). Under these

-27-

circumstances, the district court did not abuse its broad discretion in disqualifying Attorney Sandoval.

E.   Appellant Morales' Sentence Is Not Unreasonable

Morales asserts that her 27-month sentence is unreasonable because the district court judge improperly treated the Federal Sentencing Guidelines as mandatory, in violation of United States v. Booker, 543 U.S. 220 (2005).  We review the reasonableness of sentences for abuse of discretion.  Gall v. United States, 552 U.S. 38, 56 (2007).

Morales contends that the trial judge's statement that Booker "directs sentencing courts to resort to the guidelines in order to structure a reasonable sentence" demonstrates that the judge improperly treated the Federal Sentencing Guidelines as mandatory, instead of advisory.  We disagree.  In light of the district court's reference to the "now advisory Federal Sentencing Guidelines," we find that the district court treated them as advisory.  Nor did the court's analysis fail to consider the 18 U.S.C. § 3533(a) factors.  Indeed, the district court described Morales as "a first time offender" and a "productive member within her community."  As a result, the district court imposed a sentence at the bottom end of the Federal Sentencing Guidelines range, demonstrating the individualized assessment.  For these reasons, the district court did not abuse its discretion.

F.   The District Court Did Not Err In Awarding A Four-Point
     Leadership Role Enhancement

        Alfonzo argues that the district court erred in giving

him a four-point leadership role enhancement during sentencing.  A

court's decision to impose a sentencing enhancement for a

leadership role based on the facts is reviewed for clear error.

United States v. Rodríguez-Lozada, 558 F.3d 29, 44 (1st Cir. 2009).

        Under the Federal Sentencing Guidelines, a defendant's

base offense level is raised by four levels if he "was an organizer

or leader of a criminal activity that involved five or more

participants . . . ."  U.S. Sentencing Guidelines Manual § 3B1.1

(2004).  We must also consider the following factors:

> the exercise of decision making authority, the
> nature of participation in the commission of
> the offense, the recruitment of accomplices,
> the claimed right to a larger share of the
> fruits of the crime, the degree of
> participation in planning or organizing the
> offense, the nature and scope of the illegal
> activity, and the degree of control and
> authority exercised over others.

Id. at cmt. 4.  Alfonzo argues the evidence at trial showed that

there were only four participants to the crime, which he asserts

does not include his co-conspirators.  This is not correct.

Alfonzo's leadership role over his co-conspirators may be

considered for a sentencing enhancement.  See Rodríguez-Lozada,

558 F.3d at 44.  The evidence at trial showed that Alfonzo had a

leadership role in the criminal scheme involving five or more

participants.  Alfonzo recruited twenty cattlemen in Puerto Rico who testified that Alfonzo participated in inflating their damages and instructed them to obtain falsified estimates.  Alfonzo also directed Morales to falsify the loan applications submitted by the cattlemen.  Furthermore, Alfonzo bribed Torres for the required FSA authorization for loans over $300,000.  Accordingly, based on this evidence, we find that Alfonzo's four-point leadership role enhancement was not clear error.

## III.

For the foregoing reasons, we affirm on all issues.