**UNITED STATES of America,
Plaintiff,**

v.

**Frank PEAKE, Defendant.**

**Criminal No. 11–512 (DRD).**

United States District Court,
D. Puerto Rico.

Signed Dec. 6, 2013.

Brent Snyder, Craig Y. Lee, Jessica Lefort, Michael L. Whitlock, U.S. Department Of Justice, Washington, DC, Heather S. Tewksbury, United States Department of Justice, San Francisco, CA, for Plaintiff.

A. Margot Moss, David Oscar Markus, Markus & Markus, PLLC, Miami, FL, Francisco Rebollo–Casalduc, Francisco Rebollo Casalduc Law Office, San Juan, PR, for Defendant.

### AMENDED OPINION AND ORDER

DANIEL R. DOMÍNGUEZ, District Judge.

### I. Factual & Procedural History

The instant matter involves a conspiracy amongst three freight carriers, Sea Star Line ("Sea Star"), Horizon Lines ("Horizon"), and Crowley Liner ("Crowley"), to suppress and eliminate competition by agreeing to fix rates and surcharges for Puerto Rico freight services. As part of the ongoing conspiracy, various high level employees of the freight carriers would meet and conspire to raise rates for the upcoming year and would scheme on how to handle upcoming contract negotiations with potential clients. The spectrum of the conspiracy was extensive in scope and pervasive, as Sea Star earned over $900 million in revenue from Puerto Rico freight services during Peake's participation in the conspiracy. The following price increases transpired as a result of the conspiracy: ocean freight, bunker fuel surcharge, port security charge, total assessorial charge, SED documentation charge, and intermodal fuel surcharge.[1] Defendant Frank Peake ("Defendant" or "Peake"), the former President and CEO of Sea Star, was alleged to have participated in this conspiracy by acting primarily as one of the masterminds. On January 29, 2013, following a three week trial, Peake was convicted of violating U.S. Antitrust laws under 15 U.S.C. § 1.

On March 4, 2013, Defendant filed a *Motion for New Trial* under Fed. R.Crim.P. 33 ("Rule 33") and a *Motion for Judgment of Acquittal* under Fed. R.Crim.P. 29 ("Rule 29") (Docket No. 193), alleging, *inter alias,* that the Court erred in ordering the jury to continue deliberations, in refusing to give a theory of defense instruction to the jury, in allowing the United States to appeal to jury bias and prejudice, and in admitting/excluding various hearsay statements. On April 4,

---

1. Peter Baci's trial testimony proved that almost all of Sea Star's revenue from its Puerto Rico shipping operations was affected by the conspiracy:

 Q: What components of the price increased during the conspiracy?

 A: All of them.

 COURT: What do you mean by "all of them"?

 A: Ocean freight, bunker fuel surcharge, port security charge, total assessorial charge, SED documentation charge, and intermodal fuel surcharge.

 Q: To what extent were the price increases during the conspiracy the result of agreements reached with your competitors?

 A: 90 percent plus

 Tr. Vol. 4 at 151:11–23.

2013, the United States duly opposed said motion (Docket No. 195), arguing that the evidence introduced at trial overwhelmingly supported the jury's verdict, and that Defendant's motion was a rehash of issues that were repeatedly and unsuccessfully raised at trial. On August 26, 2013, Defendant filed a *Second Motion for a New Trial* (Docket No. 209) contending that the Government had failed to timely produce exculpatory *Brady* evidence. On September 6, 2013, the Government opposed said motion (Docket No. 211), averring that the unproduced recording was not favorable to Peake and that his conviction was supported by overwhelming evidence.

## II. Rule 29 and 33 Standard of Review

### a) Rule 29

"Rule 29 of the Federal Rules of Criminal Procedure provides that a court may acquit a defendant after the close of the prosecution's case if the evidence is insufficient to sustain a conviction." *United States v. Alfonzo–Reyes*, 592 F.3d 280, 289 (1st Cir.2010). "[T]he tribunal must discern whether, after assaying all the evidence in the light most flattering to the government, and taking all reasonable inferences in its favor, a rational fact finder could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the crime." *United States v. Hernández*, 146 F.3d 30, 32 (1st Cir.1998) (citing *United States v. O'Brien*, 14 F.3d 703, 706 (1st Cir.1994)); *see United States v. Marin*, 523 F.3d 24, 27 (1st Cir.2008).

In analyzing a Rule 29 motion, "[v]iewing the evidence in the light most flattering to the jury's guilty verdict, [the Court must] assess whether a reasonable factfinder could have concluded that the defendant was guilty beyond a reasonable doubt." *United States v. Lipscomb*, 539 F.3d 32, 40 (1st Cir.2008). Thus, "the jurisprudence of Rule 29 requires that a deciding court defer credibility determinations to the jury." *Hernández*, 146 F.3d at 32 (citing *O'Brien*, 14 F.3d at 706); *United States v. Walker*, 665 F.3d 212, 224 (1st Cir.2011) ("we take the facts and all reasonable inferences therefrom in the light most agreeable to the jury's verdict."). Additionally, the Court "must be satisfied that 'the guilty verdict finds support in a plausible rendition of the record.'" *United States v. Pelletier*, 666 F.3d 1, 12 (1st Cir.2011) (quoting *United States v. Hatch*, 434 F.3d 1, 4 (1st Cir.2006)). This standard is a "formidable" one, especially as "[t]he government need not present evidence that precludes every reasonable hypothesis inconsistent with guilt in order to sustain a conviction." *United States v. Loder*, 23 F.3d 586, 589–90 (1st Cir.1994) (internal quotation marks omitted). Moreover, there is no "special premium on direct evidence." *O'Brien*, 14 F.3d at 706. "[T]he prosecution may satisfy its burden of proof by direct evidence, circumstantial evidence or any combination of the two." *Id.* (citing *United States v. Echeverri*, 982 F.2d 675, 677 (1st Cir.1993)). Expressed in alternate fashion, "no premium is placed on direct as opposed to circumstantial evidence; both types of proof can adequately ground a conviction." *United States v. Ortiz*, 966 F.2d 707, 711 (1st Cir.1992). As to evidentiary conflicts, "the trial judge must resolve all evidentiary conflicts and credibility questions in the prosecution's favor; and moreover, as among competing inferences, two or more of which are plausible, the judge must choose the inference that best fits the prosecution's theory of guilt." *United States v. Olbres*, 61 F.3d 967, 970 (1st Cir.1995); *see Hernández*, 146 F.3d at 32 (the trial court is required to "consider all the evidence, direct and circumstantial, and resolve all evidentiary conflicts in favor of the verdict.") (citing *United States v. Carroll*, 105 F.3d 740, 742

(1st Cir.1997)). On the other hand, "[t]he court must reject only those evidentiary interpretations that are unreasonable, unsupportable, or only speculative and must uphold any verdict that is supported by a plausible rendition of the record." *United States v. Ofray–Campos*, 534 F.3d 1, 31–32 (1st Cir.2008). *See also United States v. Cruzado–Laureano*, 404 F.3d 470, 480 (1st Cir.2005) (urging the trial court "not to believe that no verdict other than a guilty verdict could sensibly be reached, but must only satisfy itself that the guilty verdict finds support in a plausible rendition of the record.") (citing *United States v. Gómez*, 255 F.3d 31, 35 (1st Cir.2001)).

The First Circuit reiterated the above general standard in *United States v. Meléndez–Rivas*, 566 F.3d 41 (1st Cir.2009) (citing *Lipscomb*, 539 F.3d at 40), holding that the sufficiency standard for a Motion for Acquittal under Rule 29 required the district court to determine whether, viewing the evidence in the light most favorable to the government, a reasonable fact finder could have concluded that the defendant was guilty beyond a reasonable doubt. The Court, therefore, is not to discard compliance with the requirement of the standard of "guilty beyond a reasonable doubt." However, a defendant challenging his conviction for insufficiency of the evidence faces an "uphill battle." *United States v. Hernández*, 218 F.3d 58, 64 (1st Cir.2000). Nevertheless, "despite the prosecution-friendly overtones of the standard of review, appellate oversight of sufficiency challenges is not an empty ritual." *United States v. de la Cruz–Paulino*, 61 F.3d 986, 999 n. 11 (1st Cir.1995).

### b) Rule 33

■■■ Rule 33 of the Federal Rules of Criminal Procedure provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R.Crim.P. 33(a). A new trial is not warranted if the court is "satisfied that competent, satisfactory and sufficient evidence in th[e] record supports the jury's finding that this defendant is guilty beyond a reasonable doubt[.]" *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir.1992). "In making this assessment, the judge must examine the totality of the case. All the facts and circumstances must be taken into account," and there "must be a real concern that an innocent person may have been convicted" before the "interest of justice" requires a new trial. *Id.* The ultimate test in adjudicating a Rule 33 motion to vacate "is whether letting a guilty verdict stand would be a manifest injustice." *United States v. Snype*, 441 F.3d 119, 140 (2d Cir.2006) (internal citation and quotation omitted)).

■■■ The Court may grant a new trial if the jury's "verdict is so contrary to the weight of the evidence that a new trial is required in the interest of justice." *United States v. Chambers*, 642 F.3d 588 (7th Cir.2011); *see U.S. v. Washington*, 184 F.3d 653, 657 (7th Cir.1999) ("The focus in a motion for a new trial is not on whether the testimony is so incredible that it should have been excluded. Rather, the court considers whether the verdict is against the manifest weight of the evidence, taking into account the credibility of the witnesses."). Restated, "[t]he court should grant a motion for a new trial only if the evidence 'preponderate[s] heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand.'" *U.S. v. Swan*, 486 F.3d 260, 266 (7th Cir. 2007) (quoting *U.S. v. Reed*, 875 F.2d 107, 113 (7th Cir.1989)). "[C]ourts have interpreted [Rule 33] to require a new trial in the interests of justice in a variety of situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during trial." *U.S. v.*

*Kuzniar*, 881 F.2d 466, 470 (7th Cir.1989), overruled on other grounds, 546 U.S. 12, 126 S.Ct. 403, 163 L.Ed.2d 14 (2005); *see United States v. Munoz*, 605 F.3d 359, 373 (6th Cir.2010)("it is widely agreed that Rule 33's 'interest of justice' standard allows the grant of a new trial where substantial legal error has occurred.")(internal citations omitted).

 In the final assessment, a "district court's disposition of a Rule 33 motion for a new trial in a criminal case is ordinarily a 'judgment call.'" *United States v. Connolly*, 504 F.3d 206, 211 (1st Cir.2007) (quoting *United States v. Maldonado–Rivera*, 489 F.3d 60, 65 (1st Cir.2007)). "[A]t least where the trial judge revisits the case to pass upon the new trial motion—an appreciable measure of respect [from the Circuit Court] is due to the 'presider's sense of the ebb and flow of the recently concluded trial.'" *Id.* (quoting *United States v. Natanel*, 938 F.2d 302, 313 (1st Cir.1991)); *see United States v. Falu–Gonzalez*, 205 F.3d 436, 443 (1st Cir.2000) ("We give considerable deference to the district court's broad power to weigh the evidence and assess the credibility of both the witnesses who testified at trial and those whose testimony constitutes "new" evidence.")(internal quotation omitted). In considering the weight of the evidence for purposes of adjudicating a motion for new trial, a district judge "may act as a thirteenth juror, assessing the credibility of witnesses and the weight of the evidence." *United States v. Hughes*, 505 F.3d 578, 593 (6th Cir.2007) (citation omitted). Yet, in reviewing such a request for a new trial, the Court remains ever mindful that "[t]he remedy of a new trial must be used sparingly, and only where a miscarriage of justice would otherwise result." *United States v. Conley*, 249 F.3d 38, 45 (1st Cir. 2001); *see U.S. v. Santos*, 20 F.3d 280, 285 (7th Cir.1994)("A jury verdict in a criminal case is not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly.").

### III. Analysis

#### a) Ordering the Jury To Continue Deliberations

The jury was charged late in the afternoon on Friday, January 25, 2013. On Monday, January 28th, the jury returned for its second day of deliberations. After conferring for a total of less than six hours, the jury sent a note to the judge at 2:45 PM that read: "Members of the jury have issued their respective verdicts. After discussions and revisions to the evidence we are not able to reach a unanimous verdict." (Docket No. 190, page 4).

At 3:04 PM, the undersigned sent the following note to the jury: "Please do not inform the judge how you stand numerically or otherwise. Please continue your deliberations." Id.

At 7:15 PM that same evening, the jury sent a note saying: "After strong debates and discussions, members of the jury have expressed a final individual verdict. We are still unable to reach a unanimous verdict." (Docket No. 190, page 7).

On the basis of this note, Peake moved for a mistrial outside of the presence of the jury. The Court orally denied this motion stating that it was too soon to declare a mistrial as the jury had deliberated for slightly longer than one day. The Court considered giving an *Allen* charge, *see Allen v. United States*, 164 U.S. 492, 501, 17 S.Ct. 154, 41 L.Ed. 528 (1896), but explicitly told counsel that it was too early to give such an instruction. After further consultation with the parties, the Court sent the following note to the jury at 7:25 PM: "The Court orders the jury to return tomorrow at 10:30 AM to continue delibera-

tions. Please drive home carefully and safely." *Id.*

The following day, the Court informed the parties that it was considering giving an *Allen* charge to the jury in the afternoon if they had not heard from the jury. Defendant renewed his motion for a mistrial and objected to the Court giving any form of an *Allen* charge; the United States expressed concern about giving the *Allen* charge prior to the jury stating that they had reached an impasse.

At 2:25 PM, the jury indicated that they had reached a unanimous guilty verdict.[2]

In the pending Rule 29 and Rule 33 motion (Docket No. 193), Peake argues that the Court erred in instructing the jury to continue deliberating as the jury had informed the Court that they had reached their "final" verdict and as the Court did not inform the jury that the jury retains the right to fail to agree. Peake relies upon *United States v. Angiulo*, wherein the First Circuit stated:

> To mitigate these serious possibilities of prejudice [of ordering deadlocked jurors to continue deliberating], in *United States v. Flannery*, [451 F.2d 880, 883 (1971)], we strongly advised trial courts

to balance a supplementary charge so that (1) the onus of reexamination would not be on the minority alone, saying, whenever a court instructs jurors to reexamine their positions, it should expressly address its remarks to the majority as well as the minority; (2) a jury would not feel compelled to reach agreement, saying, we expressly disapprove the [ ] statement that the case must at some time be decided; [a] jury, any number of juries, have a right to fail to agree and (3) jurors would be reminded of the burden of proof.... We think, however, that whenever a jury first informs the court that it is deadlocked, any supplemental instruction which urges the jury to return to its deliberations must include the three balancing elements stated above.

485 F.2d 37, 39–40 (1st Cir.1973) (internal quotations and citations omitted).

■■■■ This cited caselaw is applicable to remedy the coercive effects of an *Allen* charge, but is inapplicable in the present case as no *Allen* charge was provided.[3] "The defining characteristic of an *Allen* charge is that it asks jurors to reexamine

---

**2.** The jury's first day of deliberations began at 4:30 PM and ended at 5:10 PM (*See* Jury Note # 1). The jury then returned on Monday, January 28, 2013 at 9:20 AM for their second day of deliberations (*See* Jury Note # 2). At 2:45 PM on that second day, barely 5 ½ hours after starting their deliberations, the jury informed the Court that they had taken an initial vote and had failed to reach a unanimous verdict (*See* Jury Note # 4). Upon receiving said note, the Judge ordered the jury to continue deliberating. At 7:15 PM that same day, the jury once again advised the Court that they had taken a final individual verdict and were still unable to reach a unanimous decision. At 7:25 PM, the jury was discharged to continue deliberations the following morning. The jury then returned on Tuesday, January 29, 2013 at 11:35 AM for their third day of deliberations. At 2:25 PM, less than three hours later, the jury reached a final verdict.

Hence, the jury deliberated less than one hour the first day, approximately ten hours the second day, and less than three hours the third and final day, for a grand total of around 13 and a half hours, in a trial that had nine full days of evidentiary hearings, including opening and closing statements.

**3.** "In a typical *Allen* charge, the jurors are told, *inter alia*, that absolute certainty cannot be expected in the vast majority of cases, that they have a duty to reach a unanimous verdict if they can conscientiously do so, and that dissenting jury members should accord some weight to the fact that a majority of jurors hold an opposing viewpoint." *United States v. Figueroa–Encarnacion*, 343 F.3d 23, 33 n. 9 (1st Cir.2003) (citing *Allen v. United States*, 164 U.S. at 501, 17 S.Ct. 154).

their own views and the views of others." *United States v. Haynes*, 729 F.3d 178, 192 (2d Cir.2013)(quotation and citation omitted). Here, the Court did not request that the jurors examine neither their own positions nor those of their fellow jurors; in fact, the Court declined to provide an *Allen* charge because the Court did not understand the jury to be deadlocked after only deliberating for slightly longer than one day. The Court merely instructed the jury to continuing deliberating in a neutral manner. Such an instruction to continue deliberations cannot properly be considered an *Allen* charge. *See Figueroa–Encarnacion*, 343 F.3d at 32 (the Court's "instruction to continue deliberating did not contain the coercive elements of a garden-variety *Allen* charge, but was merely intended to prod the jury into continuing the effort to reach some unanimous resolution."); *see United States v. Prosperi*, 201 F.3d 1335, 1341 (11th Cir.2000)' ("The instruction given here ... cannot be properly considered an *Allen* charge. The judge's simple request that the jury continue deliberating, especially when unaware of the composition of the jury's nascent verdict, was routine and neutral. Nothing in the brief instruction suggested that a particular outcome was either desired or required and it was not 'inherently coercive.' "); *see also United States v.*

*Akel*, 337 Fed.Appx. 843, 861 (11th Cir. 2009) ("Because the court's ["simple request to continue deliberating"] did not indicate that an ultimate outcome was desired or required, it was not unduly coercive and does not constitute reversible error.").

Hence, when no *Allen* charge is given, no curative language is required. In a case of nearly identical circumstance,[4] the First Circuit cogently and compelling stated:

> The salient principle is that such 'counteractive' language is only deemed necessary where a 'dynamite charge' is delivered to a deadlocked jury. Under these circumstances, mitigating instructions alleviate the prejudice to the defendant arising from the court's insistence that a presumably hung jury endeavor to reach consensus on either acquittal or conviction. Where, as here, the judge reasonably concludes that the jury is not deadlocked in the first instance, the defendant is not prejudiced by a simple instruction to continue deliberating. The district court's instruction in this case did not imply a duty to achieve unanimity, nor was it addressed to jurors holding a minority viewpoint. It stands to reason that if a district

---

4. In *Figueroa–Encarnacion*, following a twelve day trial where the jury had deliberated for almost four hours, the jury sent the following note: "We wish to advise you that up to this moment we have not been able to reach an agreement. We understand that even if we stay deliberating for more time we will not be able to reach a verdict."

The judge, who felt it was "too early to give them an *Allen* charge," replied with the following note:

> The court received a note from you that basically says that you have not been able to reach an agreement. And you also state that even if you deliberate more time you're not going to reach an agreement.

> Well, after a 12 day trial some days we worked eight hours, some days we only worked four hours. But it's still 12 days of receiving evidence. I think it is too premature for the judge after 12 days of receiving evidence to accept that there is a deadlock. These matters do occur, and they occur sometimes more times than we would like, but they occur.

> So, what the Court is going to do is to send you home, relax, not think about the case and come back tomorrow at 9:30 AM and at which time I will provide you an instruction. Please do not begin any deliberation until you come back here tomorrow morning.

court's instruction lacks the coercive elements of an *Allen* charge, it need not include the *Allen* cure. Here, the requisite coercion is simply absent and, thus, reversal on this ground is unwarranted. *Figueroa–Encarnacion,* 343 F.3d at 32 (internal quotations and citations omitted). We find this reasoning to be not only compelling, but also entirely dispositive of Peake's argument that the Court was required to supply additional mitigating language to the jury emphasizing the jury's right to fail to reach consensus. *See United States v. Clayton,* 172 F.3d 347, 352 (5th Cir.1999). Further, the Court finds nothing coercive about merely requesting that the jury continue deliberating, especially in light of the length of the trial and the relative short duration of the jury's deliberations.[5] The jury trial in the instant case lasted ten days, one day for jury selection and nine days of evidentiary hearings (including openings and closings).

Finding nothing improper with, or improperly omitted from, the Court's instructions to the jury, Peake's Rule 29 and Rule 33 motions are hereby **DENIED** on these grounds.

### b) Refusal to Provide Theory of Defense Instruction

Peake additionally claims that the Court erred in not providing the jury with his theory of the defense instruction. Peake's proposed instruction was:

> Mr. Peake does not contest that there was a conspiracy that existed between Gabriel Serra, Kevin Gill, Gregory Glova, and Peter Baci. Rather, he contends that he did not knowingly and intentionally participate in this conspiracy and did not knowingly and intentionally join the conspiracy as a member. Mr. Peake further contends that any discussions he had with Gabriel Serra were legitimate and competitive discussions and not anticompetitive conspiracy related. Mr. Peake also contends that he was competing with Horizon, including on market share and price.

> Although this is Mr. Peake's defense, the burden always remains on the government to prove the elements of the offense beyond a reasonable doubt. If you do not believe the government has proven beyond a reasonable doubt that Mr. Peake intentionally and knowingly joined the conspiracy, you must find him not guilty.

Peake avers that the instruction should have been provided as substantial documentary evidence and testimony from the government's own witnesses support the instruction. Peake cites documentary evidence detailing the specifics of the conspiracy in which Peake's involvement is absent as well as testimony of him having legiti-

---

**5.** Peake cites a newspaper article of a post-trial interview with a juror wherein the juror states that they jury was unsure how long the Court would keep the jury deliberating if they were deadlocked. The Court notes that Federal Rule of Evidence 606(b), which bars juror testimony "as to any matter or statement occurring during the course of the jury's deliberations," prohibits the Court from delving into the interworking's of a jury outside of the context of purported juror misconduct.

Moreover, the Supreme Court has also discouraged courts from speculating into what transpired during deliberations. *See Yeager v. United States,* 557 U.S. 110, 122, 129 S.Ct. 2360, 174 L.Ed.2d 78 (2009)("Courts properly avoid such explorations into the jury's sovereign space and for good reason. The jury's deliberations are secret and not subject to outside examination.")(internal citations omitted). Further, as the United States rightly points out, the news article is hearsay, which indeed contains hearsay within the hearsay news article, and is thus entirely improper for the Court to consider.

mate business related conversations with coconspirators. Peake also makes reference to his successful efforts to place a third Sea Star vessel in the route between Florida and Puerto Rico thereby increasing the shipping capacity available, which benefitted Sea Star at the expense of its competitors. Peake additionally claims that the government's argument that providing the instruction would constitute hearsay testimony of Peake is erroneous and that by denying his instruction, the Court impermissibly penalized him for invoking his Fifth Amendment right not to testify.

 "A criminal defendant is entitled to an instruction on his theory of defense so long as the theory is legally sound and supported by evidence in the record. When a district court decides whether to give a requested instruction, it must take the evidence in the light most favorable to the defendant, without making credibility determinations or weighing conflicting evidence." *United States v. Baird,* 712 F.3d 623, 627 (1st Cir.2013)(internal citation omitted); *see U.S. v. Gamache,* 156 F.3d 1, 9 (1st Cir.1998)("[T]he district court is not allowed to weigh the evidence, make credibility determinations, or resolve conflicts in the proof. Rather, the court's function is to examine the evidence on the record and to draw those inferences as can reasonably be drawn therefrom, determining whether the proof, taken in the light most favorable to the defense can plausibly support the theory of the defense.").

 Peake's proposed instruction is merely his theory of the case: there was a conspiracy, but Peake was not a part of said conspiracy. Peake was free to argue, and indeed did argue, this version to the jury. However, "defendants cannot couch their requested instructions as 'defense theories' and expect to get them read verbatim to the jury." *United States v. New-*

*ton,* 891 F.2d 944, 950 (1st Cir.1989). Peake's defense theory that he was not involved in the conspiracy is a legitimate defense, but inappropriate as a jury instruction. Albeit, the Court granted an instruction clearly requiring the jury to find that Peake "knowingly joined the conspiracy." (*See* Docket 186, Jury Instruction No. 17).

Furthermore, Peake's proposed instruction states that "*any* discussions" he had with co-conspirator Gabriel Serra were legitimate and competitive discussions. This statement is not supported by the evidence on the record. Gabriel Serra testified that while he did have some legitimate conversations with his competitor, Frank Peake, he also had numerous "inappropriate communications" and "customer specific discussions of internal information on agreements of prices to be charged" with Peake. Serra also testified that approximately ten percent of his communications with Peake were inappropriate. Tr. Vol. 7 at 58:8–20; Tr. Vol. 8 at 111:6–13. In fact, throughout the trial, co-conspirators Greg Glova, Peter Baci, and Gabriel Serra repeatedly identified Peake as a member of the conspiracy and testified at length about his role within the conspiracy. Accordingly, the Court cannot conclude that the requested instruction was supported by the evidence and thus was a proper instruction. Hence, Peake's Rule 29 and Rule 33 motions are hereby **DENIED** on these grounds.

*c) Appeal to Jury Bias & Prejudice*

 Similar to prior arguments made during trial, Peake posits that the United States improperly appealed to the jury's bias and prejudice and therefore a mistrial is warranted. Armed with the transcript, Peake heavily cites record to argue that the Government made, and elicited statements from witnesses, to the effect that the freight companies' customers, everyday household names like Burger King

and Office Max, along with the U.S. federal government itself, paid higher shipping prices as a result of the conspiracy. Peake avers that the Government's efforts constituted "over-the-top and inappropriate appeals to sympathy and bias." (Docket No. 193, page 19).

The Court previously addressed most of Peake's argument on this front in an *Amended Opinion and Order* dated January 25, 2013 (Docket No. 178); the Court therefore adopts and incorporates by reference that *Amended Opinion and Order* into the instant *Opinion and Order.* Here, we briefly sketch the primary thrust of the Court's *Amended Opinion and Order* and, like Peake, add little to no new analysis.

As stated previously, Peake is unable to satisfy the three prong test for prejudice illuminated in *United States v. Azubike,* 504 F.3d 30, 39 (1st Cir.2007). As an initial matter, the Court notes that the Government was very clear that the victims of the conspiracy were those who directly contracted with the maritime shipping companies-the Burger Kings and Office Maxes of Puerto Rico. It was these entities who paid higher anti-competitive rates. The Government did not infer that those higher prices were passed onto the victims' customers, the general populace of Puerto Rico, in a secondary manner. Simply, the United States did not argue that hamburgers and paperclips cost more as a result of the conspiracy. Similarly, while the United States did present evidence that the U.S. Department of Agriculture paid higher food prices for the school lunch program as a result of the conspiracy; the Government did not argue that school children paid higher milk prices or went without milk as a result of the conspiracy.

Notwithstanding, to the extent that a juror may have made an inference that the conspiracy resulted in secondary consum-

ers, the general Puerto Rican population, the Court provided, not one, but two curative instructions. First, on the third full day of trial, the Court instructed the jury as follows:

Before we receive the remaining evidence I think it is critical that the Court provide you with an instruction. The fact that Puerto Rico may have potentially been affected or consumers and/or prices and/or business is not to be considered by [you] in your judgment as to the [guilt or not] guilt of the defendant. The effect on prices on consumers in Puerto Rico is not *per se* an element of the offense. You are not to decide this case based on pity and sympathy to Puerto Rican businesses, to Puerto Rico, or to Puerto Rican consumers. The effect on Puerto Rico only is material as to potentially establishing an effect on interstate commerce. This case is about a potential conspiracy in violation of the antitrust law, and whether or not, the defendant, Mr. Frank Peake, joined the conspiracy. Sympathy to Puerto Rico is, therefore, to play absolutely no role in your consideration of this case. Any statement that may have implied or that you have understood that this is a case relating to the effect on Puerto Rico is an erroneous interpretation. And I don't want you to have that interpretation. So, therefore, any effect on Puerto Rico is not to be considered at all.

Tr. Trans. (Jan. 16, 2013) at 101–02. The Court deems its instruction to have satisfactorily assuaged any concerns of improper prejudice. *See United States v. Sepulveda,* 15 F.3d 1161, 1185 (1st Cir.1993) ("Swiftness in judicial response is an important element in alleviating prejudice once the jury has been exposed to improper testimony," and "appellate courts inquiring into the effectiveness of a trial judge's curative instructions should start

with a presumption that jurors will follow a direct instruction to disregard matters improvidently brought before them."). Additionally, the Court also gave a second, similar cautionary instruction to the jury prior to beginning deliberations. Jury Instruction No. 21 (Docket No. 186, Pg. 37). The Court is confident that these two jury instructions adequately provided the necessary panacea to remedy any purported prejudice.

For the aforementioned reasons, the Court concludes that the Government did not engage in any misconduct and that the evidence presented at trial did not expose the jury to any cognizable prejudice which could not be eradicated by a curative jury instruction. Hence, Peake's Rule 29 and Rule 33 motions are hereby **DENIED** on these grounds.

### d) Admissibility of Recorded Calls and Written Interview Summary

Defendant further argues that the Court erred by: (1) admitting audio recordings of two telephone conversations between Glova and Serra; (2) excluding recorded comments between Glova and an unidentified FBI agent after the telephone calls ended; and (3) precluding the defense from introducing Glova's written statement. We take each in turn.

### i) Admissibility of Recorded Calls Between Glova and Serra

At trial, the Court admitted the audio recordings of two telephone conversations between two co-conspirators, Greg Glova and Gabriel Serra, after determining that said audio recordings were non-hearsay under Fed.R.Evid. 801(d)(2)(E). In the recordings, Glova and Serra are heard arguing about charging lower prices to clients in an attempt to decrease competition and increase profitability. At one point during the conversation, the parties briefly reference Frank Peake by name.

Defendant avers that Serra and Glova's statements in the recordings are inadmissible hearsay. The Court previously addressed most of Peake's arguments on this front in an *Opinion and Order* dated January 23, 2013 (Docket No. 174); the Court therefore adopts and incorporates by reference that *Opinion and Order* into the instant *Opinion and Order*. Here, we briefly sketch the primary thrust of the Court's Opinion and Order and, like Peake, add little to no new analysis.

Under Fed.R.Evid. 801(d)(2)(E), a statement offered against an opposing party is admissible if said statement was "made by the party's coconspirator during and in furtherance of the conspiracy." Therefore, a statement falls under the preamble of Rule 801(d)(2)(E) if it is "more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy." *United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir.1977). It is irrelevant to whom the declarant directed said statement so long as the two elements outlined in *Petrozziello* are met. *See U.S. v. McCarthy*, 961 F.2d 972, 976–77 (1st Cir.1992)(admitting numerous tape recorded conversations between an undercover officer and a coconspirator); *See also U.S. v. Cianci*, 378 F.3d 71, 101 (1st Cir.2004)(same). Hence, a statement made by a co-conspirator directed at an undercover law enforcement agent may nonetheless be admissible under FRE 801(d)(2)(E) if said statement is made in furtherance of the conspiracy and if Defendant is still a member of the conspiracy at the time of the statement.

"A district court faced with a challenge to the admission of a co-conspirator's statement must ... consider whether, in light of all the evidence, the following four conditions are satisfied by a preponder-

ance of the evidence: (1) a conspiracy existed; (2) the defendant was a member of the conspiracy; (3) the declarant was also a member of the conspiracy; and (4) the declarant's statement was made in furtherance of the conspiracy." *United States v. Díaz,* 670 F.3d 332, 348 (1st Cir.2012). We briefly reiterate the most important facts regarding the admissibility of the recorded calls, given that this issue was also previously addressed in a prior *Opinion and Order* during trial.

As to the first element, the Court finds that there was ample evidence presented at trial that a conspiracy existed. Testimony was heard from several co-conspirators, including Serra, Glova, and Baci, all of which testified about the collusion and coordination of price fixing between the primary large-scale waterborne shippers of goods to and from Puerto Rico. Additionally, multiple emails sent between Peake, Baçi, Serra, and Glova were presented at trial, showing that there was significant contact, communication, and coordination amongst members of the large-scale waterborne shippers to fix prices and discourage competition. Hence, the Court finds, by a preponderance of the evidence, that a conspiracy existed.

As to the second element, the Court finds that Peake was a member of the conspiracy at the time of the telephone calls. First, the Court heard testimony that Peake was a key member of the conspiracy, leading Sea Star's efforts to coordinate with competitors in setting shipping rates. The Government presented damaging emails of conversations between Peake and other coconspirators. The bulk of those emails show conversations pertaining to the shipping rates being offered to current and potential clients, how to achieve an equal market share of the shipping routes to Puerto Rico, and how best to maximize profitability while decreasing

competition. Consequently, the Court determines that Peake was still a co-conspirator at the time the two telephone calls took place, given that he was unaware that the FBI was about to search Sea Star's offices and that Glova had already been apprehended by the FBI. Lastly, there is no evidence that Peake had properly withdrawn from the conspiracy, which typically "requires either a full confession to authorities or a communication by the accused to his coconspirators that he has abandoned the enterprise and its goals." *United States v. Piper,* 298 F.3d 47, 53 (1st Cir. 2002).

The third factor in the analysis, Serra's membership in the conspiracy, is uncontested, as Serra himself testified that he was a member of the conspiracy and was involved in the price fixing scheme. The Court further finds that Serra, like Peake, was unaware of the FBI's search of Sea Star's offices for the simple fact that the search had not yet occurred at the time the calls took place. When Serra returned Glova's call at 9:16 AM on April 17, 2008, he did not have had any reason to believe that the conspiracy had ended, most likely believing that it was business as usual between him and Glova.

With regards to the fourth and final element, the Court finds that the calls were clearly designed to advance the primary objective of the conspiracy: price-fixing amongst competitors. *See, e.g., United States v. Rodriguez,* 525 F.3d 85, 101 (1st Cir.2008) (holding that "[a] statement is in furtherance of the conspiracy if it tends to advance the objects of the conspiracy as opposed to thwarting its purpose") (citations and internal quotation marks omitted); *United States v. Fahey,* 769 F.2d 829, 839 (1st Cir.1985) (holding that a statement "fabricated to convince the [FBI] agent that the project should be allowed to continue ... [is] made to fur-

ther the object of the conspiracy"). During the calls, Glova is clearly seeking Serra's assistance in not having to offer lower prices to a prospective client, and asks him to enlist Peake's help in the matter. Serra specifically responds that he has already discussed the matter with Peake.

Accordingly, as the evidence presented at trial showed that both Serra and the Defendant were active participants in the same conspiracy at the time of the recordings and that the statements made by Serra in the recordings were made in furtherance of said conspiracy, the Court holds that Serra's statements were admissible under FRE 801(d)(2)(E).

■■■ Defendant further avers that Glova's statements on the recordings are inadmissible hearsay, emphasizing that Glova was no longer a co-conspirator, but rather an informant, when the conversations were recorded. As such, Defendant contends that Glova's statements, as an informant, do not fall within the realm of 801(d)(2)(E). While the Court agrees that said statements are not co-conspirator admissions, they are admissible nonetheless, as the statements are not being offered for their truth but rather to provide the appropriate context for Serra's statements. *See U.S. v. Santiago*, 566 F.3d 65, 69 (1st Cir.2009)(admitting informants' statements for the limited purpose of providing the proper context for the conversations between the informants and the defendant); *United States v. Walter*, 434 F.3d 30, 34 (1st Cir.2006) (concluding that informer's out-of-court statements during taped "sting" were admissible as context for defendant's taped responsive admissions); *United States v. Cruz–Diaz*, 550 F.3d 169, 178 (1st Cir.2008) ("Out-of-court state-

ments offered not to prove the truth of the matter asserted but merely to show context-such as a statement offered for the limited purpose of showing what effect the statement had on the listener-are not hearsay.")(citing *United States v. Bailey*, 270 F.3d 83, 87 (1st Cir.2001)). Hence, the Court refuses to part from well-established First Circuit precedent regarding the admissibility of statements made by informants for the purpose of providing context to otherwise admissible statements.

For the aforementioned reasons, the Court concludes that the recorded telephone conversations between Glova and Serra were admissible. Hence, Peake's Rule 29 and Rule 33 motions are hereby **DENIED** on these grounds.

### ii) *Admissibility of Recorded Statements Between Glova and FBI Agent After Calls Ended*

During Serra's cross-examination, Defendant sought to introduce two brief statements made by Glova and the FBI agent immediately after Glova left a message for Serra on April 17, 2008. After the call, an FBI agent is heard asking Glova: "Were you referring to Frank Peake?" In response, Glova stated: "Yes, is he on your list?" Defendant's objective in seeking to introduce the statements through Serra was to impeach Glova by showing that Glova had originally neglected to mentioned Frank Peake's name to the FBI during his initial interview.[6] Defendant averred that FRE 806 allowed him to impeach Glova's testimony through Serra. The Government objected to the admissibility of said statements during Serra's cross-examination, alleging that the statements were inadmissible hearsay and that Serra lacked the requisite personal

---

**6.** At trial, Glova testified that he mentioned Frank Peake's name to the FBI during his interview, thereby implicating Peake in the conspiracy from the outset. However, Defen-

dant posits that Glova is being untruthful, contending that it was not until Glova was offered leniency that he decided to implicate Peake in the conspiracy.

knowledge to authenticate and identify the voices on the recordings.

Rule 806 states, in part, that "when a hearsay statement—or a statement described in Rule 801(d)(2)(C), (D), or (E)— has been admitted in evidence, the declarant's credibility may be attacked ... by any evidence that would be admissible for those purposes if the declarant had testified as a witness." Therefore, the recording would be admissible to impeach Glova's hearsay statement, or a statement described in Rule 801(d)(2)(C), (D), or (E), if the prior statement was in fact inconsistent with what transpired between Glova and the FBI agent.

Defendant's contention, that the recording should be admitted into evidence for impeachment purposes, is unavailing for two reasons: (1) Defendant failed to show that the statements in the recording contradicted Glova's prior testimony, thereby making said statements hearsay not falling within any of the exceptions prescribed in FRE 803; and (2) the recording could not be authenticated through Serra, as he lacked personal knowledge of the events in question.

First, Defendant's argument that Glova's brief question to the FBI agent is contradictory to his trial testimony is unpersuasive. Glova merely asks the FBI agent whether Frank Peake was on their list, referring to a list being compiled by the FBI of all the individuals involved in the conspiracy. No reasonable jury could infer that Glova's testimony at trial had been inconsistent with what actual transpired during his interview simply from listening to Glova's question to the FBI.

Furthermore, Rule 806 only applies to situations where a party seeks to impeach a declarant's credibility through another witness when a declarant's statement has been admitted under FRE 801(d)(2)(C), (D), or (E) or FRE 803. The situation presented at trial was not one contemplated under FRE 806, as Defendant was merely seeking to impeach Glova's trial testimony that he mentioned Peake's name during the FBI interview. Glova's testimony that he mentioned Peake's name during the FBI interview is neither a hearsay statement nor a statement described in Rule 801(d)(2)(C), (D), or (E), as said declaration is not an out of court statement being offered for its truth, but rather a first-hand account of what transpired during the FBI interview.

Second, even if the Court determined that the statements in the recordings were contradictory to Glova's testimony at trial, it would have been impossible for Defendant to authenticate the recording through Serra, as Serra lacked the requisite firsthand knowledge to identify the FBI agent heard speaking in the recording. Notwithstanding, the Court advised Defendant that it had the option of recalling Glova to the stand in order to question him about the statements made in the recording, an option which Defendant failed to exercise. Tr. Vol. 8 at 10:1119.

Accordingly, the Court concludes that the recorded comments between Glova and the unidentified FBI agent were inadmissible. Hence, Peake's Rule 29 and Rule 33 motions are hereby **DENIED** on these grounds.

### iii) *Admissibility of Glova's Written Statement*

At trial, the defense sought to introduce Glova's written statement to the FBI in an attempt to impeach him. The United States objected to its admissibility, arguing that the statement was hearsay under FRE 801. The Court agreed with the Government that Glova's written statement was hearsay, but nonetheless accorded defense counsel wide discretion by allow him to cross examine Glova "line-by-

line" with his written statement. Tr. Vol. 3 at 144:7–11. Although the Court has broad discretion in determining whether to admit a witness's prior inconsistent statement, and thus whether the witness may be impeached by the prior statement, the Court in the case at bar in unconvinced that Glova's testimony at trial was inconsistent with his written statement to the FBI. *Udemba v. Nicoli*, 237 F.3d 8, 18 (1st Cir.2001)(internal citations omitted). In any event, by allowing Defendant to cross-examine Glova with his prior written statement, the Court cured any potential harm that Peake might have suffered from any alleged inconsistency in Glova's written statement.

Accordingly, the Court concludes that Glova's written statement to the FBI is inadmissible hearsay. Hence, Peake's Rule 29 and Rule 33 motions are hereby **DENIED** on these grounds.

### e) Admissibility of Defendant's Compensation and Sea Star's Profits and Losses

 Defendant further avers that the Court erred in admitting evidence regarding Peake's compensation and Sea Star's profitability. At trial, over Defendant's objection, the Government presented evidence of Peake's salary and compensation in an effort to show his financial motive for engaging in the price-fixing scheme. The Court finds that evidence of Defendant's salary and bonuses, particularly evidence showing an increase in compensation as a result of Sea Star's profitability, is relevant under Federal Rule of Evidence 401 and that said evidence's probative value is substantially outweighed by the dangers of unfair prejudice to the Defendant under FRE 403. Evidence of Peake's compensation is highly probative to show not only that he had a financial interest in the success of the corporation, but also to establish a motive for why

Defendant allegedly participated in the conspiracy. To minimize any bias that said evidence might bestow on Defendant, the Government did not introduce evidence of Defendant's overall net worth, assets, or lifestyle.

 Peake further contends that evidence pertaining to Sea Star's profitability was erroneously admitted at trial, arguing that the Government failed to link Sea Star's profits to the conspiracy. The evidence presented at trial showed that Sea Star's profitability drastically increased after the alleged start of the conspiracy, making said evidence probative under Rules 401 and 403. Baci's testimony regarding Sea Star's finances both before and during the conspiracy provided a factual basis for the admissibility of said documents. Additionally, the financial records demonstrate that Sea Star was running a deficit before the conspiracy and subsequently turned a profit once the conspiracy commended. Hence, the evidence may have a tendency, under FRE 401, to make the existence of the conspiracy more or less probable.

Accordingly, the Court concludes that evidence pertaining to Peake's compensation and to Sea Star's profitability is substantially more relevant than prejudicial under FRE 403. Therefore, Peake's Rule 29 and Rule 33 motions are hereby **DENIED** on these grounds.

### f) Brady Violation Regarding Non–Disclosure of Confidential Informant Recording # 5

Defendant, in its second motion for a new trial (Docket No. 209), alleges that the Government violated its obligations under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), when it failed to timely produce an audio recording which it possessed for more than five years. The recording in question was

made on April 8, 2008, nine days before the FBI raided Sea Star's offices, and details a long conversation between Baci, Fox, LaGoy, and William Stallings, the confidential informant ("CI"). Baci, the head of Sea Star's pricing department, was in charge of setting the prices that Fox, LaGoy, and the CI could offer to their customers during pricing negotiations. Peake did not partake in the recorded conversation and was only briefly mentioned twice. The first reference pertains to a former business contact that Peake had at Home Depot. CI Red. 5 Tr. at 66. The second merely hints that Peake had a business lunch planned that same day with Fox.

 To succeed on a post-trial *Brady* violation claim, Peake must show that: (1) the evidence at issue was favorable to him; (2) that the evidence was either willfully or inadvertently suppressed by the government; and (3) that he was prejudiced by the non-disclosure. *U.S. v. Mathur,* 624 F.3d 498, 503 (1st Cir.2010); *U.S. v. Connolly,* 504 F.3d 206, 212 (1st Cir. 2007); *see Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). To establish that he was prejudiced by the nondisclosure, Peake must show that there is a reasonable probability that the outcome of the trial would have been different had CI Recording 5 been timely produced. *See Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Furthermore, if the undisclosed evidence served to impeach one of the Government's witnesses, a new trial may be warranted if said evidence suffices "[t]o undermine confidence in the outcome of the trial." *See Connolly,* 504 F.3d at 213; *U.S. v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)(applying *Brady* test to impeachment evidence).

 The first prong of the *Brady* analysis requires Peake to show that the undisclosed evidence was favorable to him, a burden which he has failed to meet. The defense posits a myriad of reasons as to why the audio recording is favorable to Peake. First, they aver that the fact that Peake was not present in the meeting, that he was not invited, and that he was not mentioned as being part of the conspiracy are all exculpatory. Second, Peake argues that his name was only referenced twice in the meeting, and that in both instances, Stallings, the CI, had the opportunity to inquire about his role in the conspiracy and failed to do so. Peake reasons that Stallings would have pushed on this point had he believed that Peake was part of the ongoing conspiracy. Third, Defendant contends that the recording clearly establishes that Baci, and not Peake, is the brains behind the operation, as Carl Fox is heard claiming on the recording that "[t]he hunt is according to what Peter [Baci] says we can hunt." CI Red. 5 Tr. at 95. Lastly, Defendant argues that it would have been able to impeach both Glova and Baci at trial with the recording, claiming that their respective testimonies with regards to numerous potential clients are inconsistent with the evidence heard in CI Recording 5.

The Government counters that the audio recording was merely a continuation of the discussion on CI Recording 2, which was provided to Peake during discovery, and that the neutral discussion focuses on various customer accounts. The Government argues that the main reason why Peake's name was barely mentioned in the meeting was because only one of the four individuals present, Peter Baci, was a participant in the conspiracy. Hence, it would have been surprising for Baci to make explicit incriminating statements about the conspiracy or anyone involved therein to three non-conspirators. Lastly, the Government argues that the evidence contained in the

recording is not *Brady* evidence, given that the meeting was not a conspiratorial discussion of the conspiracy's members and **no one stated that Peake was not a member of the conspiracy.**

The Court, in holding that CI Recording 5 is in no way favorable to Peake, agrees with the United States that the recording is cumulative evidence of the other CI recordings that were originally produced to Peake. CI Recording 5 contains references to certain accounts, such as Office Max, Aqua Golf, Caribbean Shipping, and Walgreens, which Peake avers could have been used for impeachment purposes. However, CI Recording 2 contains similar discussions about the aforementioned accounts, including an in depth discussion on Walgreens and references to Aqua Gold and Caribbean Shipping. CI Rec. 2 Tr. at 18–22 and 60:20–63:7. Had Peake wanted to cross-examine Baci about the Walgreens, Aqua Golf, and Caribbean Shipping accounts, he could have done so using CI Recording 2.

In deciding that the recording in question is not favorable to Peake, the Court strongly emphasizes that only one of the four members taking part in the sales team meeting was part of the price-fixing conspiracy. This would explain why Peake did not partake in the meeting, why there were no conversations implicating Peake in the conspiracy, and why Baci neglected to describe the conspiracy or its participants. **The Court finds no conversations in CI Recording 5 that are potentially exculpatory or, at the very least, somewhat favorable to Peake.** Although Peake's name is mentioned twice in the recording, said references bear no relevance as to his inclusion or exclusion from the conspiracy. Furthermore, Baci testified that he was tasked with managing the day-to-day pricing for Sea Star's customers, thereby explaining Peake's absence from the meeting.

With regards to the second prong, it is undisputed that the Government inadvertently suppressed the audio recording. According to the U.S. Department of Justice, the FBI did not disclose to them that there was an additional recording in connection to the Puerto Rico water freight investigation until August 5, 2013, more than five months after the conclusion of Peake's trial.

The third prong of the analysis requires Peake to show that there is a reasonable probability that the outcome of the trial would have been different had CI Recording 5 been timely produced. *See Kyles,* 514 U.S. at 434, 115 S.Ct. 1555. The Court holds that the jury verdict was supported by overwhelming evidence, including written emails signed by or addressed to Defendant Peake. Further, there is no reasonable probability that the outcome of the case would have been different had CI Recording 5 been timely produced.

The Court agrees with the United States that the conspiracy could not have been as successful without Peake (Docket No. 215, Pg. 8). Although the evidence at trial showed that Sea Star's Baci and Horizon's Glova and Gill handled the day-to-day operations of the conspiracy, it was Peake and Serra, the two top executives of Sea Star and Horizon, that ultimately resolved the difficult issues. Tr. Vol. 2 at 57–59; Tr. Vol. 5 at 17–21, 24–26; Tr. Vol. 7 at 56–59, 85–86. In its *Sentencing Memorandum,* the Government refers to one instance where Glova requested customer pricing information from Baci, but was unable to obtain it. Glova informed Serra of the noncompliance, and Serra immediately communicated with Peake in an effort to obtain the information, which was subsequently produced to Horizon (Docket No. 215, Pg. 8). *See* Tr. Exs. 33–35. Another

instance referenced by the United States was when Peake became involved in a dispute between Sea Star and Horizon wherein Sea Star was not getting the agreed upon 50% of the market share of cargo moved between Florida and Puerto Rico. *Id.; See* Tr. Exs. 73, 182.

At trial, the jury heard testimony from Greg Glova, Horizons' Pricing Director for Puerto Rico Freight Services, who testified that he actively participated in the conspiracy from 2005–2008. When he was promoted to director, Kevin Gill, the previous director, explained to him that Sea Star, Horizon, and Crowley had been discussing the shipping rates between them since 2002 and that the main participants in those communications were Peter Baci and Frank Peake from Sea Star and Tom Farmer from Crowley. The co-conspirators would communicate via email, using Gmail accounts with coded names, and/or by telephone. Whenever there was a dispute as to pricing, Baci and Glova's respective bosses, Peake and Gabriel Serra, would converse and make a final determination. Glova further indicated that the four of them met twice in Orlando, Florida, once in October 2006 and once in August 2007, to strategize. According to Glova, during the October 2006 meeting the co-conspirators discussed and agreed in principle upon the prices and rates of shipping, fuel surcharges, and port surcharges for 2007. Further, the co-conspirators reached agreements regarding the types of cargo included in the 50/50 agreement[7] and conspired to let each other win certain accounts in order to make up for market share imbalance. There was also an agreement between Horizon and Sea Star whereby neither company would undercut each other for house accounts. *See* Tr. Vol. 2 at 78–79, 109; Tr. Vol. 5 at 122–24, 130–32; Tr. Vol. 7 at 114–15, 118–21, 129–32; Tr. Exs. 1, 5–7, 24, 26.

Through Glova, the United States admitted several email communications incriminating Frank Peake in the conspiracy. Baci and Glova, tasked with handling the majority of the day-to-day price fixing activities, used secret email accounts in order to shield their identities.[8] The majority of the emails sent back and forth between Glova and Baci detail the inner-workings of the conspiracy, thereby demonstrating how Sea Star and Horizon were able to effectively decrease competition and increase their profitability. Baci and Glova would constantly plot how to handle bidding for new customer accounts and how to, in essence, maintain an equal market share of the freight shipping from Florida to Puerto Rico.

Peter Baci, who worked as the Senior Vice President of Sea Star Line in Jacksonville, Florida from 2002–2008, also took the stand, and testified that since 2003 he would report directly to Peake. Baci recounted how Horizon and Sea Star initially started to conspire to fix rates after Navieras' bankruptcy in 2002, and indicated that he dealt with both Kevin Gill and Glova. At first, they would communicate via telephone or fax, but they eventually began using secret email accounts with the hope of disguising their scheme.

Baci further testified that he would communicate face to face with Glova, and that Serra and Peake would communicate amongst themselves. On a number of occasions, Peake and Serra were summoned

---

**7.** The 50/50 Rule refers to an agreement between Sea Star and Horizon, whereby both companies would strive to maintain an equal market share of all goods, dry and refrigerated, being shipped to Puerto Rico.

**8.** Peter Baci's email was lighthouse123@gmail.com and Greg Glova's email wassouthorange@gmail.com.

by Baci and Glova to resolve pricing disputes between Horizon and Sea Star. Additionally, Baci recounted how Peake became CEO and President of Sea Star in 2004 and how they would regularly discuss how to effectively increase prices in order to increase Sea Star's profitability.

**Lastly, Baci attested that he, Serra, Glova, and Peake all met on at least three occasions to plan illicit antitrust conduct relating to their respective clients, thereby corroborating Glova's testimony to that effect.** One of the meetings took place in Orlando, Florida in October 2006, where the parties met to discuss the 50/50 cargo shipments and the planned rate increases for the following year. In 2007, all four met again in Jacksonville, Florida to discuss the handling of the upcoming contract negotiations with Aqua Golf. Similarly, Baci, Peake, and Glova met once more in 2008, this time in New York, to discuss the 50/50 rule. The testimony of Baci, standing alone, as to the three meetings, is technically sufficient to find Defendant guilty. However, there was corroborating evidence provided by other co-conspirators, as stated herein, coupled with emails signed by and received by Peake, as well as additional email communications between the other coconspirators implicating Peake as a participant in the conspiracy.

The members of the jury also heard testimony from Gabriel Serra, the former general manager of Horizon's Puerto Rico division. Serra testified that he and Peake would actively discuss price fixing in the Florida ship market, and that Peake even advocated and obtained an agreement from Horizon to charge higher fuel sur-

charges on longer routes.[9] Tr. Vol. 2 at 121–23; Tr. Vol. 4 at 91–97; Tr. Vol. 7 at 156–57; Tr. Exs. 49–56. Serra also indicated that he had met with Baci, Peake, and Glova in Orlando, Florida in October 2006 to discuss the 50/50 market share agreement between Sea Star and Horizon and the rate increases for the following year.

Serra further testified that, on one occasion, Sea Star lost the Walgreens account to Horizon, thereby tipping the market share balance heavily in Horizon's favor. As a result of this imbalance, Peake and Serra agreed that Horizon would purchase space on Sea Star's ships until Horizon could shift some of its customers over to Sea Star. Tr. Vol. 7 at 88–89; Tr. Exs. 57, 70.

Serra and Peake would communicate regularly via email and telephone, but, unlike Baci and Glova, they would use their work emails.[10] Numerous email conversations between Peake and Serra were admitted during the Government's case-in-chief, most of which show Defendant's involvement in the overall scheme. Dozens of emails between Peake, Baci, Glova, and Serra illustrate that Peake was actively engaged in the decision-making process, and show how the Horizon and Sea Star executives communicated, quite frequently, about jointly raising shipping rates and maintaining a leveled playing field regarding the number of customer accounts.

For example, Exhibits 21, 22, 53, 67, 126, 149, 169, 176, 222, and 239 are all prime examples of email conversations between Baci and Glova detailing the inner-workings of the conspiracy. Said emails show

---

9. For many years, the shipping companies had charged the same bunker fuel surcharge on all shipping routes to Puerto Rico, regardless of the length of the routes. At Peake's insistence, Horizon agreed to start charging higher fuel surcharges on the longer routes, with Sea Star agreeing to match Horizon's

May 2007 bunker fuel surcharge increase in return.

10. Frank Peake's email was fpeake@seastarline.com and Gabriel Serra's email wasgserra@horizonlines.com.

how Sea Star and Horizon methodically planned out their proposals to potential clients, with the optimal goal of increasing profitability and maintaining a balanced market share between them. Both sides would email each other the proposals that they would submit to potential clients, and lay out their rate increase plans for the following years.

Additionally, Exhibits 26, 32, and 34 are email conversations involving Serra and Peake which further implicate Peake in the price fixing conspiracy.[11] [12] [13] In said emails, Peake and Serra are seen arguing about client accounts, with Peake stating that "things aren't working as well as they were" and that Baci had similar complaints, in reference to their price fixing endeavors.

Furthermore, the Court notes that from August 1, 2003 to April 10, 2008, Serra and Peake communicated a total of 319 times using their personal telephones (Exhibit 279), with 215 calls being initiated by

Peake, circumstantial evidence further corroborating the testimony of the three cooperators.

Accordingly, the Court finds that there was overwhelming evidence presented at trial to support Peake's conviction. Even if the United States had timely produced CI Recording 5 to Defendant, there is no reasonable probability that the outcome of the trial would have been any different. Hence, Peake's *Second Motion for New Trial* (Docket No. 209) is hereby **DENIED** on these grounds.

### IV. Conclusion

For the reasons stated herein, the Court hereby **DENIES** all of Defendant's Rule 29 and Rule 33 motions (Docket Nos. 193 and 209).

**IT IS SO ORDERED.**

---

**11.** Exhibit 26 contains two emails constituting circumstantial evidence as to an agreement relating to market sharing. The last email in the link, sent by Serra to Baci and Glova, with a copy to Peake, ends with "**Read and delete . . . of course!**"

**12.** Exhibit 32 contains a three email conversation between Serra and Peake in March 2008. In the first email, dated March 6, 2008, Serra confronts Peake about Sea Star's shipping rates, telling Peake that "[he] is playing into AGT's and Transnow's hand . . . do you want me to react? . . . they've now given me Paul's numbers." The second email contains Peake's response, wherein he tells Serra "please do not ever send me an email like this again! I would like to think that **my/our performance** in the market over the past 4 ½ years would at least get me the benefit of the doubt. . . . To my knowledge we have NOT exceeded our allocation in the NE this year. I am not sure about the reefers, but I will check on that in the AM." (emphasis ours) The third and final email is Serra's response, urging Peake to "see the trend over the last few weeks and let's figure out a plan."

Hence, these three emails clearly portray that there was an already agreed upon allocation by the members of the conspiracy as to the types of services being offered in the North East and as to the reefers (refrigerated vans).

**13.** Exhibit 34 also constitutes evidence of a conspiracy as to market sharing, wherein Peake informs Serra that in "the past 2 weeks you are hurting me. Flexi, Goya, Atek, and BK. If you are swinging at Crowley you are missing and hitting me. Not good!" This email is titled "Ouch!" In his second email to Serra, sent on March 22, 2008 at 7:19 PM, Peake is annoyed ("Ouch!") at the fact that "things aren't working as well as they were. Pete [Baci] has similar complaints. Flexi is about fuel and you gave them a BSC discount. Tisk tisk. Goya is about you not charging for the overweight permits. Again tisk tisk. **Same as cutting the rate in my book.**" Serra replies that he will "check them all . . . you are certainly not the target."